**CAMPBELL SOUP COMPANY**

v.

**CONAGRA, INC.; Sallie W. Rosenthal**

**ConAgra, Inc. and Sallie Rosenthal, Appellants.**

**No. 91–5997.**

United States Court of Appeals, Third Circuit.

Argued June 22, 1992.

Decided Oct. 13, 1992.

Circuit, was limited to voting for panel rehearing.

Stephen M. Orlofsky, Blank, Rome, Comisky & McCauley, Cherry Hill, N.J., Leo A. Knowles (argued), McGrath, North, Mullin & Kratz, Omaha, Neb., Carlo Scaramella, Richter & Scaramella, Cherry Hill, N.J., for appellants.

David H. Pittinsky (argued), Patrick T. Davish, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., and John M. Coleman, Sr. Vice President—Law and Public Affairs and Corporate Secretary, John M. Mason, Chief Litigation Counsel, James K. Baughman, Corporate Counsel, Campbell Soup Co., Camden, N.J., for appellee.

Present: BECKER, HUTCHINSON and ALITO, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

ConAgra, Inc. (ConAgra) appeals an order of the United States District Court for the District of New Jersey granting appellee Campbell Soup Company's (Campbell's) application for a preliminary injunction. *Campbell Soup Company v. ConAgra, Inc.*, 801 F.Supp. 1298 (D.N.J.1991). The district court enjoined ConAgra from using or exploiting a patent on a process for creating a non-fried frozen chicken product which is supposed to taste like it has been fried when it has not (non-fried chicken) and from using the process embodied in the patent in researching, marketing or selling non-fried frozen chicken products. ConAgra raises a variety of arguments on appeal as to why the district court erred in granting a preliminary injunction, including Campbell's failure to make a clear showing

of immediate irreparable harm.[1] We agree with ConAgra on this point and will vacate the order granting the preliminary injunction and remand to the district court for further proceedings.

## I.

Sallie W. Rosenthal (Rosenthal) grew up on a poultry farm and pursued an education in poultry science. Rosenthal holds a Bachelor of Science degree in Food Science and a Master of Science degree in Food Science and Poultry and Avian Sciences, both from Cornell University. In March of 1984, Rosenthal began working for Campbell and signed a "Patent Trade Secret Agreement Relating To Invention, Business Ideas And Trade Secrets" (agreement). The agreement provided, in relevant part:

All inventions (whether patentable or not and whether new developments or improvements) and all business ideas that are used by or useful to the Company in operating its business which I conceive while employed by it, shall be the Company's property. Any such inventions and ideas I conceive of within one year after my employment terminates shall also be the Company's property if they result from and relate to my work for the Company.

Joint Appendix (Jt.App.) at 925. Rosenthal was assigned to work for Campbell's Swanson line of frozen foods.

Approximately one month after joining Campbell, Rosenthal became involved with Swanson's "Never–Fried Chicken" project. The project covered Swanson's efforts to produce a frozen chicken product for consumer consumption that tasted like fried chicken without being fried. Many of Campbell's competitors in the frozen food industry had also been trying for years to develop a non-fried chicken product. Jerry Webb (Webb), Research Program Leader for Campbell, described the status of Campbell's work on that project at the time of Rosenthal's arrival as follows:

[T]he process at that time was to take a piece of chicken, skinless chicken, inject the piece of chicken with salt phosphate solution, precook the chicken, boil it at this time, we are talking about early 1984, then predust, badder [sic] and bread that part, the breader containing beaded shortening and oil spray and then cook it through a high temperature MPO [Multi–Purpose Oven] and freeze the product.

*Id.* at 569. Webb testified that it was the entire process, and not the individual elements making it up, which allowed Campbell to eliminate the "fry" step from the process. On June 5, 1984, Rosenthal authored a memorandum describing the unique aspects of the Never–Fried Chicken process, including the use of a humidified or MPO oven to bake the breaded chicken, the use of encapsulated fat or margarine spray to improve the coating flavor and the use of the special bread crumbs and the oven to perfect the appearance of the chicken.

In early 1985, Rosenthal had an interview for a position with ConAgra. ConAgra sells the "Banquet" line of frozen foods and is one of Campbell's main competitors. Rosenthal falsified her employment application to ConAgra by checking off "no" in response to a question asking whether she had any "agreement with employers or others concerning inventions" she had made or might make in the future. *Id.* at 927. On March 4, 1985, Campbell terminated Rosenthal after she told them she had accepted a position with ConAgra. Seven weeks later Campbell sent a letter to ConAgra regarding the agreement Rosenthal had with Campbell and identifying the Campbell projects Rosenthal worked on, including a non-fried chicken project that,

---

1. ConAgra raises the following additional issues on appeal: (1) whether the information Campbell seeks to protect is a trade secret; (2) if it is a trade secret, whether ConAgra misappropriated the information; (3) whether the district court's injunction was overbroad; (4) whether certain factual findings were clearly erroneous; and (5) whether Campbell was entitled to prevail on its breach of contract and tortious interference claims for purposes of the preliminary injunction. Because we hold that Campbell failed to make a clear showing of immediate irreparable harm, it is not necessary to consider these other issues.

according to Campbell, involved trade secrets.

When Rosenthal started at ConAgra, David Scherpf (Scherpf), ConAgra's Director of Product Development for Banquet Foods, left it to Rosenthal to decide which projects she could and could not work on based on her agreement with Campbell. At that time ConAgra was pursuing a project similar to Campbell's Never–Fried Chicken project, which ConAgra called "Light & Crispy" or "Nova Chicken" (Nova Chicken). Unlike Campbell, ConAgra had yet to eliminate all frying steps from its preparation process for Nova Chicken.

Shortly after her arrival at ConAgra, Rosenthal was assigned to the Nova Chicken project. In a March 18, 1985 memorandum written by Ron Wesley (Wesley), a ConAgra employee who had been working on ConAgra's Nova Chicken project, Wesley described to Rosenthal the methods ConAgra was using to try to eliminate the frying step in its project. The memorandum does not mention the use of a bread crumb mixture using encapsulated fat or the spraying or misting of a liquid margarine mix to form the coating of the never-fried chicken project. It does mention use of an MPO or humidified oven to bake a skinless chicken injected with a solution that contains phosphate and sodium that has been predusted, battered, breaded and par-fried (an industry term for "partially" fried).

Rosenthal's lab notes show that within two months of joining ConAgra she was experimenting with processes that did not involve a fry or par-fry step. In her experiments she was using an MPO or humidified oven at about the same temperatures used at Campbell and a thirteen-percent beaded shortening, steps similar to Campbell's. Shortly thereafter, the Nova Chicken project was branded "Top Secret" by ConAgra and it began preparing Nova Chicken for commercial exploitation.

In July of 1986, Rosenthal and ConAgra filed their first patent application for the Nova Chicken process. Their application was wholly rejected three times and partially rejected once, but finally approved by the United States Patent Office in January of 1990. Before securing the patent ('438 Patent), ConAgra test-marketed its product during mid–1986. It was a failure and ConAgra does not intend to market it.

There is no evidence in the record that Campbell continued to work on the Never–Fried Chicken project after 1987. (*See* A.571) Apparently Campbell put the project on hold until 1991, twelve months after Rosenthal and ConAgra received their patent, when Campbell again began to work on the project. To date Campbell has been unable to produce an acceptable non-fried chicken product.[2]

Campbell never formally designated the Never–Fried Chicken project as a trade secret but did undertake certain precautions to preserve secrecy. All employees working on the project were required to sign agreements similar to Rosenthal's. Employees were told to keep the Never–Fried Chicken research under lock and key in their desks. Campbell's Camden and Farmington research facilities were secured and no one could enter without an escort. Also, as happened in this case, once an employee announced that he or she was leaving to join a competitor, Campbell thereafter excluded the employee from its research facilities and sent a "warning" letter to the new employer. The formula for the Never–Fried Chicken product, however, was not kept in Campbell's vault with other top-secret formulae, apparently because it was not yet in production.

## II.

On March 15, 1991, Campbell filed a six-count complaint in the United States District Court for the District of New Jersey alleging breaches of contract and fiduciary duty against Rosenthal, tortious interference against ConAgra and misappropriation of trade secrets and unjust enrichment against both ConAgra and Rosenthal. The complaint also alleged that ConAgra and

---

**2.** At oral argument counsel for Campbell stated that as of the time of trial, Campbell's Never– Fried Chicken project was still in the research/testing stage.

Rosenthal engaged in a civil conspiracy against Campbell. Three days later, Campbell moved for a preliminary injunction against ConAgra and Rosenthal. On July 18, 1991, Campbell filed an amended complaint alleging the same six causes of action but changed the description of the proprietary information Campbell was seeking to protect.

Over a one-week period in late August and early September of 1991, the district court conducted hearings on Campbell's motion for a preliminary injunction. In an order entered on November 13, 1991, the district court granted Campbell's application for a preliminary injunction. The order enjoined ConAgra "from using or exploiting the '438 patent in any way whatsoever including, but not by way of limitation, the marketing, licensing or selling of any product based upon the '438 patent," and

> from using the following process to research, market or sell any non-fried frozen food product:
>
> 1) injecting skinless chicken with a phosphate solution;
> 2) predusting the injected chicken;
> 3) battering the predusted product;
> 4) applying a bread crumb mixture with encapsulated fat or beaded shortening to the battered product;
> 5) spraying or misting the battered and breaded chicken with vegetable oil; and
> 6) baking the battered and breaded product in a high temperature humidified oven.

*Id.* at 1439–40. In its accompanying opinion, the court held that Campbell had met its burden of showing that it was likely to succeed on the merits of its claims for misappropriation of trade secrets and tortious interference. The court also held that Campbell had met its burden of proving that it was likely to succeed on the merits of its breach of contract claim against Rosenthal because the contract required her to keep all trade secrets confidential but had not shown a likelihood of success on its claim that the contract entitled Campbell to all inventions and ideas

Rosenthal had conceived within one year of her departure from Campbell's. The court also concluded that Campbell had not satisfied its burden of showing a likelihood of success on its fiduciary claim because an employee's fiduciary duty to her employer ends with the termination of her employment under New Jersey law. The district court did not discuss Campbell's unjust enrichment and civil conspiracy claims. Apparently they were not pressed at the hearing.

Continuing, the court held that Campbell had made a clear showing of immediate irreparable harm, "since the '438 patent gives ConAgra the exclusive rights to utilize the process developed at Campbell to Campbell's detriment," and that ConAgra would not be similarly harmed by issuance of an injunction. *Id.* at 1437. Finally, the court noted that in this Circuit, once the elements of a trade secret claim have been established, it is not necessary for the district court to engage in an extended analysis of the public interest, citing *SI Handling Systems v. Heisley*, 753 F.2d 1244, 1265 (3d Cir.1985).

ConAgra and Rosenthal filed a timely notice of appeal on December 5, 1991. Campbell did not cross-appeal, and therefore the claims concerning civil conspiracy, unjust enrichment and fiduciary duty are not now before us.

### III.

We have appellate jurisdiction over the order of the district court granting a preliminary injunction in favor of Campbell under 28 U.S.C.A. § 1292(a)(1) (West Supp. 1992). The district court had diversity jurisdiction under 28 U.S.C.A. § 1332(a)(1) (West Supp.1992).

We recently set forth the burden of proof a party seeking a preliminary injunction must meet along with our standard of review on appeal from an order granting a preliminary injunction in *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir.1990) (citations omitted):

> In order to support a preliminary injunction, plaintiff must show both a like-

lihood of success on the merits and a probability of irreparable harm. Additionally, the district court should consider the effect of the issuance of a preliminary injunction on other interested persons and the public interest. A district court's denial of a preliminary injunction will be affirmed unless the court abused its discretion, committed an obvious error of law, or made a serious mistake in considering the proof.

Furthermore, a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a "clear showing of *immediate* irreparable harm." *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.), *cert. denied*, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989) (emphasis added) (internal quotation omitted).

### IV.

ConAgra argues that the district court committed an obvious error of law in granting the preliminary injunction because Campbell failed to make a clear showing of a likelihood of immediate irreparable harm. In its opinion the district court concluded that Campbell clearly demonstrated that it would be irreparably harmed without the aid of an injunction, stating:

> Campbell contends that it will suffer irreparable harm if ConAgra and Rosenthal are not preliminarily enjoined from using and disclosing Campbell's trade secrets and other confidential and proprietary information relating to Campbell's frozen food technology. The court agrees. In the '438 patent, ConAgra and Rosenthal have already disclosed to the public Campbell's trade secrets and proprietary information. ConAgra and Rosenthal's further use of Campbell's proprietary frozen poultry technology will lead to more irreparable harm. A clear showing of immediate irreparable harm is met since the '438 patent gives ConAgra the exclusive rights to utilize the process developed at Campbell to Campbell's detriment.

App. at 1437. ConAgra contends that the district court erred because any harm that Campbell suffered by reason of Rosenthal's asserted breach of her agreement not to disclose Campbell's trade secrets concerning non-fried chicken was past harm that cannot be properly redressed by a *preliminary* injunction, and any future harm could not possibly have been shown because ConAgra's Nova Chicken project has never been marketed, was unsuccessfully test marketed in 1986 and has been dormant since that time. In addition, ConAgra points out that Campbell does not have a marketable product even at this time.

Campbell argues that ConAgra's dogged prosecution of its application for the patent that allegedly revealed Campbell's trade secrets is sufficient evidence to show that the threat of irreparable harm is "real and immediate." Brief of Appellee at 41. In addition, Campbell argues that "irreparable harm must be presumed where, as here, the elements of a trade secret claim have been satisfied." *Id.* at 40.

■ This Court has often addressed the issue of when a preliminary injunction to prevent immediate irreparable harm is justified and conversely, when other remedies such as money damages are adequate to compensate a plaintiff for past harm. The law in that respect is clear in this Circuit:

> In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm. *See e.g., Weinberger v. Romero–Barcelo*, 456 U.S. 305 [102 S.Ct. 1798, 72 L.Ed.2d 91] (1982); *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356 and n. 9 (3d Cir.1980).

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (emphasis added). In *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987) (citations omitted) we stated:

> Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a "clear showing of immediate irreparable injury." The "requisite

feared injury or harm must be irreparable—not merely serious or substantial," and it "must be of a peculiar nature, so that compensation in money cannot atone for it."

[4, 5] Under these authorities, the district court erred in granting a preliminary injunction on the evidence presented. First, the evidence did not show Campbell was threatened with irreparable injury based on the disclosure of the alleged trade secret. At oral argument counsel for Campbell argued that a preliminary injunction was necessary to alleviate immediate irreparable harm because of the possibility that ConAgra would "further disclose" the alleged trade secret. We fail to see how immediate irreparable harm could arise at this time in light of the fact that ConAgra has *already* revealed the non-fried process in a patent application. Presumably, ConAgra revealed the process it thought was the "best mode" of producing a non-fried chicken product that had the taste and appearance of being fried in compliance with 35 U.S.C.A. § 112 (West 1984). A threat of disclosure may establish immediate irreparable harm but "further" disclosure of something already revealed cannot. Second, the evidence did not establish that Campbell was faced with immediate irreparable harm based on the marketing of a competing product using the alleged trade secret. There was no evidence that ConAgra was close to marketing a product based on that technology. On the contrary, a ConAgra employee testified that its non-fried chicken process had not produced a satisfactory product and was therefore "dormant." Campbell provided no contradictory evidence. Third, the evidence did not show that ConAgra's patent was impeding Campbell's development of its Never–Fried Chicken technology. Finally, neither the district court's opinion nor Campbell's submissions on appeal explain why any harm that Campbell might suffer due to ConAgra's purely internal use of the alleged trade secret during the pendency of his action could not be fully compensated by damages. Therefore, we do not believe that Campbell satisfied its burden of proving irreparable injury. If,

at some point before final judgment, Campbell perfects its Never–Fried Chicken technology, is prepared to market the product *and* ConAgra is likely to file an infringement action, Campbell may then be able to establish immediate irreparable harm and secure an injunction effectively exempting the product from any infringement claims brought by ConAgra concerning the '438 patent. Campbell has not contended, however, that perfection of a non-fried chicken taste is probable, much less that it may occur immediately. As we have stated,

> [i]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued "to restrain one from doing what he is not attempting and does not intend to do."

*Continental Group, Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir.1980) (citation omitted).

Campbell also argues that there is "abundant and binding authority holding that irreparable harm must be presumed where, as here, the elements of a trade secret claim have been satisfied." Brief of Appellee at 40 (citing *Heisley*, 753 F.2d at 1264–65). *Heisley* does not support that proposition. The extract from *Heisley* cited by Campbell addresses the public interest factor a court should consider in deciding whether to issue a preliminary injunction, not the factor of immediate irreparable harm. There, in *Heisley*, we merely stated:

> It was not necessary for the district court to engage in extended analysis of the public interest—extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established.

*Heisley*, 753 F.2d at 1265. We analyzed irreparable harm separately in *Heisley* and held it was present. *Id.* at 1264. In *Heisley* there was ample evidence that trade secrets were about to be used unless action was taken compelling the defendant to maintain their secrecy. *Id.* Indeed, we fully agree with Campbell that an intention to make imminent or continued use of a trade secret or to disclose it to a competitor

will almost certainly show immediate irreparable harm, but here the record shows ConAgra had discontinued its past use of Campbell's process and has no plans to renew its no-fry chicken project. Campbell has presented no evidence that ConAgra is about to use the technology Campbell seeks to protect. That technology has been a failure in ConAgra's hands and ConAgra has ceased its efforts to use any secret technology Rosenthal brought with her from Campbell to market a non-fried chicken product in the frozen food market where it competes with Campbell. Were ConAgra to resume its efforts to produce a satisfactory non-fried chicken product or indicate resumption was imminent, the situation would be otherwise and Campbell would be free to seek appropriate equitable relief.

In our judgment, this case is less closely related to *Heisley* than to *Continental Group.* Campbell's argument that *Continental Group* can be distinguished because it involved the disclosure of confidential information rather than a trade secret as a distinction devoid of meaning is not persuasive. Indeed, in *Continental Group,* we relied on an analogy to trade secret cases, where, we said, " '[t]here must be a substantial threat of impending injury before an injunction will issue.' " *Continental Group,* 614 F.2d at 359 n. 14 (quoting *Allis–Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.,* 255 F.Supp. 645, 654 (E.D.Mich.1966)).

### V.

For the reasons set out, we will vacate the district court's order granting a preliminary injunction and remand for further proceedings consistent with this opinion.