Maia CAPLAN

v.

**FELLHEIMER EICHEN BRAVERMAN & KASKEY and David L. Braverman.**

Civ. A. No. 94–7506.

United States District Court, E.D. Pennsylvania.

May 25, 1995.

Lisa E. Brody, William H. Ewing, Carl Oxholm, III, Connolly, Epstein, Chicco, Foxman, Edelmyer and Ewing, Philadelphia, PA, for plaintiff Maia Caplan.

Suzanne M. Bohannon, Carolyn P. Short, Kenneth M. Kolaski, Philip W. Newcomer, Reed, Smith, Shaw & McClay, Helen Mandel Braverman, Fellheimer, Eichen and Braverman, P.C., Philadelphia, PA, for defendant Fellheimer Eichen Braverman & Kaskey.

Suzanne M. Bohannon, Carolyn P. Short, Kenneth M. Kolaski, Philip W. Newcomer, Reed, Smith, Shaw & McClay, Philadelphia, PA, Thomas A. Riley, Jr., Riley, Riper, Hollin & Colagreco, Paoli, PA, Helen Mandel Braverman, Fellheimer, Eichen and Braverman, P.C., Philadelphia, PA, for defendant David L. Braverman.

Linda A. Carpenter, McCann, Mailey & Geschke, Philadelphia, PA, for movant Linda Della Rocco.

Gregory B. Heller, Litvin, Blumberg, Matusow & Young, Philadelphia, PA, pro se.

## MEMORANDUM

JOYNER, District Judge.

Today we resolve Defendants' Emergency Motion to Declare Purported Settlement Null and Void and for other Ancillary Relief. This motion for injunctive relief is opposed by Plaintiff and accordingly, an emergency hearing was held by this Court on May 23, 1995. Following are Findings of Fact, a discussion, and Conclusions of Law.

### FINDINGS OF FACT

1. Plaintiff, Maia Caplan, has brought a lawsuit against her former employer Fellheimer Eichen Braverman & Kaskey (the Firm) and the principal shareholder and managing partner of the Firm, David Braverman. Caplan's Amended Complaint alleges that Braverman and other members of the Firm created a hostile environment for women at the Firm and sexually harassed Caplan's female secretary. Caplan alleges that she was fired in retaliation for her protests against these actions.

2. Caplan's Amended Complaint asserts causes of action against both Braverman and the Firm for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–17 (1994), as well as negligent and intentional infliction of emotional distress, tortious interference with existing and prospective contracts, libel, and defamation.

3. Both Defendants asserted counterclaims against Caplan for malicious abuse of process and civil conspiracy to maliciously abuse process. These counterclaims were dismissed by this Court for failure to state a claim upon which relief could be granted. The tort of malicious prosecution was discussed in both the briefs and this Court's memorandum, but this Court held that such a claim was untimely because the action had not terminated in Defendants' favor.

4. On February 9, 1995, Defendants' insurance carrier, the Vigilant Insurance Company, agreed to provide Defendants with a defense for this lawsuit under a complete reservation of rights. The duty to defend was triggered by the defamation claim in the Amended Complaint.

*Settlement Negotiations between Plaintiff and Defendants*

5. During the months of April and May, 1995, the parties engaged in settlement nego-

tiations. Each side had a certain number of non-negotiable demands. The major focus of the settlement negotiations was Defendants' demand that any settlement would include a public retraction by Plaintiff of the allegations made in her Complaint.

6. In May, the settlement negotiations neared completion. On May 9, 1995, at 8:09 a.m., Plaintiff's attorney faxed a letter to Defendants' attorney indicating that Plaintiff had accepted certain retraction language proposed by Defendants the day before. This agreement was subject to certain conditions.

7. On May 10, 1995, Plaintiff's attorney faxed a letter to Defendants' attorney indicating that Plaintiff did not accept new language added by Defendants to the agreed-upon retraction.

8. On May 17, 1995, after more settlement discussions, Plaintiff's attorney faxed Defendants' attorney a letter confirming that no settlement had been reached between the parties, and that all Plaintiff's outstanding settlement offers had been withdrawn. This letter also indicates that Plaintiff had decided not to sign a public retraction, although she would be willing to settle without such a retraction.

### Vigilant's Settlement Negotiations

9. Simultaneously with the settlement negotiations between Plaintiff and Defendants, Defendants were negotiating with their insurance carrier, Vigilant, for a full Settlement Agreement and Release of Insurance Agreement in exchange for $190,000.00.

10. On May 10, 1995, Vigilant forwarded a copy of a Settlement Agreement and Release of Insurance Agreement to Defendants for their signatures. Defendants did not accept this agreement, but proposed additional language.

11. On May 15, 1995, Vigilant agreed to the addition, and requested Defendants to forward a draft of that language for inclusion into the agreement. There is no indication that this language was ever prepared by Defendants.

12. Vigilant decided that Defendants' demand for a public retraction from Plaintiff was going to prevent a settlement with Plain-

tiff, and determined to negotiate directly with her. On May 17, 1995, Vigilant's attorney contacted this Court and indicated that a settlement was close, and requested a settlement conference with the Court.

13. Defendants' attorney immediately wrote this Court in response and indicated on behalf of both parties that no settlement had been reached. On Defendants' behalf, she informed the Court that Vigilant had no authority to communicate with the Court nor interfere with settlement issues.

14. Vigilant was aware of Defendants' concerns with the retraction requirement as well as Defendants' belief that Vigilant had no power to effect a settlement with Plaintiff because on May 4, 1995, Defendants' attorney had notified Vigilant's attorney in a letter of her concern that Vigilant was conducting settlement negotiations without her present. She informed Vigilant that she needed to participate in all negotiations and that no settlement would be agreeable to Defendants without certain features, including the public retraction.

### Settlement

15. A settlement conference was scheduled with Chief Magistrate Judge Powers for the morning of May 22, 1995. At the last minute, this conference was postponed, due to Braverman's attorney's vacation schedule.

16. Vigilant's attorney apparently did not learn of the postponement and arrived for the settlement conference. While he was there, Plaintiff's attorney called Chief Magistrate Judge Powers, and the two attorneys decided to continue settlement negotiations between themselves.

17. Pursuant to the meeting between Plaintiff's and Vigilant's attorneys on May 22, 1995, a settlement was reached in which Plaintiff executed a General Release and a Stipulation of Dismissal in exchange for $200,000.00.

18. Defendants promptly filed this emergency motion to prevent payment of the settlement proceeds and to prevent further settlement negotiations between Vigilant and Plaintiff.

## DISCUSSION

 Rule 65(a) of the Federal Rules of Civil Procedure establishes the federal standard governing requests for preliminary injunctions. *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989) (quoting *System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1141 (3d Cir.1977)). Injunctive relief is an extraordinary remedy that should be granted only in limited circumstances. *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988). At the trial level, the party seeking a preliminary injunction bears the burden of convincing the court that:

(1) the movant has shown a reasonable probability of success on the merits;

(2) the movant will be irreparably injured by denial of relief;

(3) granting preliminary relief will not result in even greater harm to the other party; and

(4) granting preliminary relief will be in the public interest.

*Campbell Soup Co. v. Conagra, Inc.,* 977 F.2d 86, 90–91 (3d Cir.1992); *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987). Showing a risk of mere irreparable harm is not enough to warrant injunctive relief. A plaintiff must make a "clear showing of immediate irreparable (not merely serious or substantial) injury of a peculiar nature so that compensation in money cannot atone for it." *Campbell Soup,* 977 F.2d at 91–92; *ECRI,* 809 F.2d at 226; *In re Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1145 (3d Cir.1982).

### A. Likelihood of Success on the Merits

The merits we examine here are not the merits of the litigation between Plaintiff and Defendants, but the question whether Defendants can have the litigation settled for them by their insurance carrier. We recognize that the insurance carrier is not a party to this action, and indeed, only made a statement at the hearing over the objections of

Defendants. Nonetheless, this question is central to the conflict before us, and accordingly, must be addressed.

The insurance contract between Defendants and Vigilant is not in evidence before us. It allegedly, however, has a clause which grants Vigilant the power to make such settlements as it thinks appropriate. We assume for the sake of this Motion that this clause is in the insurance contract. Similar clauses have been interpreted to grant almost unlimited power to insurance companies to settle a case within the policy limits. *Bleday v. Oum Group,* 435 Pa.Super. 395, 645 A.2d 1358, 1360 (1994), *app. denied,* 655 A.2d 981 (1995). *Bleday* is apparently the only Pennsylvania case to address the issue of whether an insurance company can settle a case over the objections of its insured.[1]

The Pennsylvania Superior Court examined the case-law of other states and determined that an insurance company settles in bad faith, even if it settles within the policy limits, if the settlement is "contrary to the intent and expectation of the parties." *Id.* at 399, 645 A.2d at 1360–61. A bad faith settlement could be found in two situations. The first situation would be if an insurance company settled with some of several plaintiffs for the full amount of the policy, leaving the insured liable for an excess judgment to the remaining plaintiffs. *Id.* at 403, 645 A.2d at 1362. This situation has no bearing here.

The second situation the Superior Court posited would exist if the insurance company settled "without regard to the fact that it may be barring a counterclaim of the insured." *Id.* at 403, 645 A.2d at 1363 (citing *Shuster v. South Broward Hosp.,* 591 So.2d 174 (Fla.1992), citing *Barney v. Aetna Cas. & Sur. Co.,* 185 Cal.App.3d 966, 230 Cal.Rptr. 215 (1986)). *Barney* involved a defendant in an automobile accident case. Although the insured was the defendant, the insurance company was aware that the insured had a viable claim for damages against the Plaintiff. Despite this, it effected a settlement that included a general release of its in-

---

1. *Bleday* and the other cases cited in this opinion, are different from this case in that they are breach of contract actions alleging bad faith settlement of underlying actions. We find that despite this difference, these cases are instructive, given that apparently no reported case has addressed this precise issue.

sured's claims against the plaintiff. The California Court of Appeal held that the insurance company had a fiduciary duty not to interfere with its insured's rights, and by requiring him to release his rights, the insurer acted in bad faith. *Id.* at 221, 223 (insured has reasonable expectation that insurer will not act to insured's detriment "in the form of derogation of a collateral right").

This is in contrast to *Shuster,* where the insured was a doctor who refused to settle on the ground that the medical malpractice lawsuit against him was meritless. He sued his insurer for bad faith settlement and pleaded loss of reputation as his damage. The Florida Supreme Court held that the doctor did not present any unusual circumstances, such as barring a counterclaim, that would require his consent before a settlement. 591 So.2d at 177–78.

The question here is whether Defendants have a reasonable likelihood of showing that their rights will be prejudiced by a settlement and that Vigilant was aware of this when it negotiated a settlement with Plaintiff. We find first, that Defendants' rights could be prejudiced if Vigilant settles the case over Defendants' objections without exacting a public retraction from Plaintiff. This is because a settlement would potentially bar a later action by Defendants against Plaintiff for malicious prosecution. That claim would be barred because it is dependent upon a successful termination of the underlying litigation, and precedent suggests that a settlement does not qualify as a successful termination. *See e.g., Harvey v. Pincus,* 549 F.Supp. 332, 339 (E.D.Pa.1982), *aff'd,* 716 F.2d 890 (3d Cir.1983); *Junod v. Bader,* 312 Pa.Super. 92, 458 A.2d 251 (1983).

Second, we find that Vigilant was well aware of Defendants', especially Braverman's, interests in protecting and clearing their reputations.[2] It had knowledge of this through the counterclaims Defendants asserted, from the demands Defendants made in all settlement negotiations, and through letters and other communications from Defendants and their attorneys to Vigilant.

For these reasons, we find that Defendants have adequately demonstrated that they have a reasonable probability of success on the merits of their assertion that Vigilant has no authority to make this settlement with Plaintiff on Defendants' behalf.

*B. Irreparable Injury*

Defendants argue that they will be irreparably harmed if the settlement between Plaintiff and Vigilant is allowed to stand because it includes no public retraction by Plaintiff. Defendants assert that loss of reputation and business is the type of injury that money damages cannot repair, and that their chance to bring a malicious prosecution action is put in jeopardy by a settlement. *Bateman v. Ford Motor Co.,* 302 F.2d 63, 66 (7th Cir.1962); *Harvey,* 549 F.Supp. at 339; *Junod,* 312 Pa.Super. at 96, 458 A.2d at 253. Defendants cannot, and do not argue that they are harmed by Plaintiff's action in executing a general release of their liability, as she has done.

We found above that Defendants' ability to seek legal redress in a malicious prosecution action could be damaged by this settlement. This is irreparable injury of the caliber that can support a preliminary injunction and would be immediate upon execution of the settlement.

*C. Harm to Other Party*

If this Court grants the requested relief, Plaintiff suffers an obvious harm in that she will not receive a check for $200,000.00 from Vigilant in the next day or two. Settlement negotiations between Defendants and Plaintiff, however, came very close to completion several times and there is no reason why a settlement should not be made after all this is done. By granting this injunction, we of course do not foreclose the chance of settlement. Indeed, now that all parties' cards appear to be on the table (and on the front page of the Legal Intelligencer) settlement could still be reached. For this reason, although Plaintiff will suffer some harm if we

---

2. This and any other statements are not to be interpreted as opinions on the merits of Plain- tiff's claims.

grant this injunction, we find that this harm is not greater than the harm Defendants would suffer by losing the opportunity they currently have to attempt to clear their names.

### D. Public Policy

A motion for a preliminary injunction is an equitable action, and this situation is particularly suited for equitable relief. The behavior of Plaintiff and Vigilant in this saga has not been exemplary. Both were well aware that Defendants were determined that they would only accept either a settlement with a public retraction or the chance to go to a jury. Both were also well aware that Defendants believed that Vigilant could not settle without their consent. Despite this knowledge, both went behind Defendants' backs to work out a settlement that ignored Defendants' most important demand. The settlement served only to leave Defendants' reputations besmirched, with no opportunity to defend or pursue other legal recourse.

As Plaintiff points out, public interest would certainly be served by having this acrimonious litigation laid to rest. Public interest is not served though, by taking away Defendants' right not to be buried without a fight, either at the settlement table or before a jury of their peers.

## CONCLUSIONS OF LAW

1. Defendants have shown a reasonable likelihood of success on the merits, that they will suffer irreparable harm if the injunction is not granted, that granting the injunction will not harm Plaintiff more than them, and that an injunction will be in the public interest.

2. Due to this showing, a preliminary injunction shall be entered.