Norman BARDSLEY, Plaintiff,

v.

POWELL, TRACHTMAN, LOGAN, CARRLE & BOWMAN, P.C., et al., Defendants.

No. 95–CV–2287.

United States District Court, E.D. Pennsylvania.

Feb. 12, 1996.

---

Steven E. Angstreich, Steven P. Burkett, Michael Coren, Levy, Angstreich, Finney, Baldante, Mann & Burkett, P.C., Philadelphia, PA, for Plaintiff.

Andrew L. Braunfeld, Margaret Mary Maguire, Masterson, Braunfeld, Maguire and Brown, Norristown, PA, for Defendants Powell, P.C., Joel P. Perilstein and Jonathan K. Hollin.

Mark C. Schultz, Sherr, Joffe & Zuckerman, P.C., W. Conshocken, PA, for Defendants Scott E. Bardley, Leigh Bardley and David E. Miller.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

We address today the motion for a preliminary injunction filed by the plaintiff in this dispute arising from a struggle for control of Inofast Manufacturing, Inc., a Pennsylvania company engaged in the manufacture of fasteners. The plaintiff is Norman Bardsley ("Norman"), a United States citizen domiciled in Austria, and a shareholder and director of Inofast. Norman commenced this action by filing a complaint on April 19, 1995, naming as defendants Powell, Trachtman, Logan, Carrle & Bowman, P.C. ("Powell, Trachtman"), a Montgomery County law firm that served as corporate counsel to Inofast; Joel P. Perilstein and Jonathan K. Hollin, who are members of the Powell, Trachtman firm; Scott Bardsley ("Scott"), who is Norman's twin brother and a shareholder of Inofast; Leigh Bardsley ("Leigh"), who is Scott and Norman's father; and David Miller. Inofast has been named as a nominal defendant.

The gravamen of Norman's complaint is that Scott and the other defendants entered into a series of unlawful transactions for the purpose of divesting Norman of his majority shareholder status. Norman has set forth claims under the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act, as well as a number of common law claims. In the instant motion, Norman asks this Court primarily to set aside the elections of Inofast officers and directors conducted during the previous three annual shareholders' meetings and issue an order voiding the disputed transactions and restoring him to his majority status. A hearing on the motion was conducted on October 5, 1995 and January 3, 1996. The parties have since submitted their proposed findings of fact and conclusions of law. Accordingly, the matter is now ripe for decision.

### FINDINGS OF FACT

1. Inofast was incorporated in 1981. Its stock was owned by Norman, who held 18,750 shares; Scott, who owned 11,250 shares; and Mr. Miller, Guy Mallick, Jonathan Price and Klaus Neuber, who collectively held 45,000 shares. Tr., 10/5/95, p. 3.

2. Scott had ten years' experience in the fastener industry prior to Inofast's formation, and was responsible for its day-to-day operation. Norman was a passive investor. Tr., 10/5/95, p. 52; 1/3/96, p. 105.

3. As of 1985, Messrs. Miller, Mallick, Price and Neuber had sold their shares back to Inofast. Thus, Norman's 18,750 shares represented 62.5% of Inofast's issued stock, while Scott's 11,250 shares accounted for the remaining 37.5% of the issued stock. Tr., 1/3/96, p. 43.

4. By 1986, Scott felt the need to bring the expertise of Messrs. Miller and Mallick back into the company. Moreover, Scott was convinced that the only way to achieve this end was to offer them an ownership interest. Tr., 1/3/96, p. 106.

5. Accordingly, the three Bardsleys and Messrs. Miller and Mallick entered into a shareholders' agreement, which provides that the signatories "own all of the issued and

outstanding stock of the corporation," in the following percentages:

| | |
|---|---|
| Norman | 35% |
| Scott | 25% |
| Mr. Mallick | 20% |
| Mr. Miller | 10% |
| Leigh | 10% |

Plaintiff's Ex. 13.

6. The same five individuals signed shareholders' agreements in 1987 and 1989. The agreements are identical to the 1986 agreement with respect to the stock ownership arrangement. Plaintiff's Exs. 14, 15.

7. The transfer of shares to Leigh and Messrs. Mallick and Miller was to be achieved via gifting from Norman and Scott. Tr., 1/3/96, p. 10. Scott testified that there was a plan "to gift shares over a number of years to the various recipients." Tr., 1/3/96, p. 53.

8. There arose a dispute, however, regarding who would be liable for the gift tax associated with the transactions. Leigh and Messrs. Mallick and Miller indicated that they were unwilling to pay the associated gift tax. Tr., 10/5/95, p. 16.

9. There was never any agreement between Scott and Norman to pay the tax on behalf of the donees. Tr., 10/5/95, p. 16; 1/3/96, p. 53.

10. Mr. Mallick testified that as a result of the gift tax dispute, the shares provided for him in the three shareholders' agreements were never transferred to him. Tr., 1/3/96, p. 10. Likewise, Mr. Miller has indicated that he never received any stock as a result of any of the three shareholders' agreements. Plaintiff's Ex. 36.

11. There is no mention in any of the three shareholders' agreements of either the mechanism by which the transfer of stock would be achieved or the party responsible for paying the gift tax. Indeed, Scott himself testified that no gifting of stock ever occurred. Tr., 1/3/96, p. 48.

12. In August of 1991, Norman returned to the United States and began working with Inofast for the purpose of establishing a subsidiary in Austria. Tr., 10/5/95, p. 17.

13. Norman testified that the company's performance had declined in the years immediately preceding his return. For example, sales had fallen from $3.341 million in 1989 to $2.666 million in 1991. Tr., 10/5/95, pp. 18–19; Plaintiff's Exs. 3, 5, 7.

14. For the year ending September 30, 1991, Inofast incurred a pre-tax net loss of $173,069; and its liabilities exceeded its assets by $243,628. Plaintiff's Ex. 9.

15. Gross revenues fell to $1.897 million in 1994. Plaintiff's Ex. 12.

16. On the other hand, Inofast reduced its debt by $370,000 between the years 1991–1995. Tr., 1/3/96, pp. 89–90.

17. Scott attributed the company's poorer performance to a shift in emphasis from distribution to manufacturing, which he felt was necessary to maintain the long term health of the company. Moreover, Scott pointed to the recent decline in federal spending for national defense to explain the fiscal down trend. Tr., 10/5/95, pp. 19–20; 1/3/96, pp. 114, 148.

18. The relationship between the two brothers began to sour. Norman objected to the leadership Scott was providing for Inofast. He threatened to file a lawsuit, and frequently told Scott that he intended to use his voting power to take control of the company. Tr., 1/3/96, p. 149.

19. Both Scott and Norman became personal guarantors of 50% of Inofast's debt. Tr., 10/5/95, pp. 9–10; 1/3/96, pp. 30–31.

20. In preparation for the 1993 shareholders' meeting, Norman requested Mr. Perilstein to provide him with a list of shareholders who would be entitled to vote. Tr., 10/5/95, p. 24.

21. Mr. Perilstein advised Norman that the shareholders and their respective ownership interests were as follows:

| | |
|---|---|
| Norman | 18,750 shares |
| Scott | 13,392.857 shares |
| Leigh | 5,357 shares |
| Mr. Miller | 5,357.143 shares |

Plaintiff's Ex. 54.

22. Mr. Miller did not receive any of his shares until 1993, when he purchased 5,357.143 shares of authorized but unissued stock. In order to facilitate this transaction,

Scott unilaterally authorized Inofast to award Mr. Miller a bonus in excess of $21,000 to cover the cost of the shares and the related taxes. Tr., 1/3/96, p. 50.

23. Leigh did not receive his shares until 1992, shares which came to him by way of a gift from the corporation. Tr., 1/3/96, p. 77. This transaction occurred as a result of a meeting attended by only Scott and Leigh. Tr., 1/3/96, p. 57.

24. Prior to the 1993 shareholders' meeting, Scott unilaterally caused the corporation to issue 2,142.857 shares to himself. Tr., 1/3/96, p. 149–50.

25. Thus, Scott caused 12,857 additional shares to be issued without Norman's knowledge or approval. These shares were voted in such a manner as to allow Scott to gain control of the board of directors. Tr., 1/3/96, pp. 149–50.

26. Following the 1993 shareholders' meeting, Scott caused Inofast to issue an additional 5,359 bonus shares to himself, bringing his total to 18,751.857 shares, 1.857 more shares than Norman's interest. This transaction occurred pursuant to a shareholders' meeting held on October 19, 1993, attended by Leigh and Scott. Norman, who was in Austria, had requested an agenda prior to the meeting, but his request went unanswered. Tr., 1/3/96, pp. 38–40.

27. On December 2, 1993, Norman initiated a declaratory judgment action in the Court of Common Pleas of Montgomery County regarding the ownership of Inofast. This suit was subsequently withdrawn. Tr., 10/5/95, p. 66.

28. On June 16, 1994, Norman commenced a second suit in Montgomery County, making claims for (1) injunctive and declaratory relief; (2) violation of fiduciary duties; (3) fraud and misrepresentation; and (4) violation of the Pennsylvania Business Corporation Law. On June 17, the court issued an injunction enjoining the defendants from performing major corporate functions. The parties have complied with this injunction. The Montgomery County action remains pending.

## DISCUSSION

 In the instant motion, Norman asks this Court for an injunctive order to (1) appoint independent counsel to represent Inofast; (2) set aside the elections of Inofast officers and directors conducted during the previous three annual shareholders' meetings; and (3) order that Inofast conduct its affairs as if Norman controlled 62.5% of the 30,000 outstanding and issued shares. In weighing Norman's request, we are mindful that injunctive relief is an extraordinary remedy that should be granted only in limited circumstances. *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988). Thus, the onus is on the movant to show by sufficient evidence that (1) he is likely to succeed on the merits; (2) he will suffer irreparable harm if relief is denied; (3) the granting of injunctive relief will not result in greater harm to the adverse party; and (4) the granting of injunctive relief is in the public interest. *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90–91 (3d Cir.1992); *Orson, Inc. v. Miramax Film Corp.*, 836 F.Supp. 309, 311 (E.D.Pa. 1993).

 Upon review of the evidence presented at the hearing viewed in light of the standard articulated above, we conclude that injunctive relief is unwarranted. Specifically, we find that Norman has failed to convince us that he will suffer irreparable harm if relief is denied.[1] Norman argues that Inofast's fiscal condition has declined precipitously under Scott's stewardship, and that he is at risk in that he has personally guaranteed one half of Inofast's debt. Moreover, he contends that "if provisional action is not taken and taken quickly to address the declining financial situation at Inofast, *there might not be* a Company at all at the conclusion of this litigation for Plaintiff to regain control over. . . ." Plaintiff's Memo. at 7 (emphasis added).

---

1. We resolve this motion today solely on the basis of Plaintiff's inability to prove irreparable harm. Thus, we need not address issues such as the validity of the shareholders' agreements, whether Inofast's current counsel should be disqualified, or the legality of the transactions by which Plaintiff lost his majority shareholder status.

458

 Unfortunately for Norman, this is precisely the type of harm for which there is no injunctive remedy. The cases make clear that injunctive relief is unwarranted where the harm will occur, if at all, only in the indefinite future. Indeed, our Court of Appeals requires that there be a "clear showing of *immediate* irreparable harm" before an injunction may issue. *Campbell Soup*, 977 F.2d at 91 (citation and internal quotation omitted). Moreover, the harm must rise to a level beyond serious and substantial harm; and it must be of a nature so peculiar that money alone cannot compensate for it. *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987); *Orson*, 836 F.Supp. at 311.

Here, the harm that animates Norman's request for relief, as he concedes in the emphasized excerpt from his Memorandum quoted above, is speculative, and not immediate. Norman has presented evidence of Inofast's financial decline, but not of its imminent collapse. Indeed, Defendants have presented some evidence to suggest that Inofast's financial state is improving. Moreover, the damages that Norman either has suffered or may suffer are not irreparable, but are instead measurable and compensable monetarily. Thus, the harm alleged here is ill-suited for an injunctive remedy. Finally, we note that Norman has failed to present evidence to suggest that Scott's leadership has caused the financial problems at Inofast, or that its fiscal condition would improve if the company's reins were placed in Norman's hands. For these reasons, we conclude that an injunctive remedy here is inappropriate. Accordingly, we enter the following

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.[2]

2. Plaintiff has failed to show by sufficient evidence that he will suffer irreparable harm if the instant motion is denied.

**2.** Pending before us are two motions to dismiss, which raise jurisdictional issues. Our conclusion here does not address the arguments in

3. Accordingly, Plaintiff's Motion for a Preliminary Injunction will be denied.

An appropriate order follows.

### ORDER

AND NOW, this 12th day of February, 1996, upon consideration of Plaintiff's Motion for a Preliminary Injunction, and the response thereto, and after a hearing on this matter on October 5, 1995 and January 3, 1996, it is hereby ORDERED, for the reasons set forth in the preceding Memorandum, that said Motion is DENIED.

favor of dismissal. Thus, we assert jurisdiction over this action today for the sole purpose of disposing of the instant motion.