PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2991
_____

SIEMENS USA HOLDINGS Inc; SIEMENS INDUSTRY
INC,
                    Appellants

v.

RICHARD J. GEISENBERGER, in his capacity as the
Secretary of Finance for the State of Delaware; BRENDA
MAYRACK, in her capacity as the Delaware State Escheator;
MICHELLE M. SULLIVAN, in her capacity as the Assistant
Director of the Office of Unclaimed Property; STATE OF
DELAWARE
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-19-cv-2284)
District Judge:  Hon. Maryellen Noreika
_____

Argued
April 16, 2021

Before: CHAGARES, JORDAN, and SCIRICA, *Circuit Judges.*

(Filed: October 28, 2021)
_____

Diane Green-Kelly  [ARGUED]
Reed Smith
10 S. Wacker Drive – 40th Fl.
Chicago, IL   60606

R. Eric Hutz
Reed Smith
1201 Market Street – Ste. 1500
Wilmington, DE  19801
      *Counsel for Appellant*

Mary F. Dugan   [ARGUED]
Martin S. Lessner
Melanie K. Sharp
Robert M. Vrana
Young Conaway Startatt & Taylor
1000 N. King Street
Wilmington, DE   19801
      *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This appeal centers on the law of escheat, under which a citizen's abandoned property may end up in a sovereign's treasury. Delaware's Unclaimed Property Law ("UPL"), Del. Code Ann. tit. 12, § 1101 *et seq.*, allows the state to escheat certain types of unclaimed property held by businesses chartered in the state, if the particular business holding the property is not the owner of it, and if there has been no contact with the owner for a specified period of time. *See id.* § 1133 (stating when property is presumed abandoned); § 1136 (listing indications of owner interest in property).

Seeking to enforce its escheat law, Delaware initiated an audit of Siemens USA Holdings, Inc. and Siemens Industry, Inc. (collectively "Siemens") and related entities, which are incorporated under Delaware law. After a near-decade-long audit process, Siemens brought suit against the state and Richard Geisenberger, in his capacity as the Delaware Secretary of Finance, Brenda Mayrack, in her capacity as the Delaware State Escheator, and Michelle Sullivan, in her capacity as the Assistant Director of the Office of Unclaimed Property (collectively, the "Defendants"). Siemens challenges the constitutionality of the audit and argues that Delaware's actions conflict with federal common law limiting the scope of any state's escheatment authority. Approximately four months after filing its complaint, and while a motion to dismiss was pending, Siemens filed a motion to preliminarily enjoin the Defendants from enforcing Delaware's UPL against it. In a single order, the District Court dismissed the majority of Siemens's claims and denied the motion for a preliminary injunction on the sole surviving claim, which alleged a violation of procedural due process.

3

Because the District Court erred in concluding that Siemens failed to show irreparable harm based on its procedural due process claim, and in dismissing Siemens's federal preemption claim as unripe, we will vacate and remand.

## I.  BACKGROUND

### A.  Escheat Legal Landscape

Derived from feudal property concepts, "escheat is a procedure by which 'a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears.'" *Univar, Inc. v. Geisenberger*, 409 F. Supp. 3d 273, 276 (D. Del. 2019) (quoting *Texas v. New Jersey*, 379 U.S. 674, 675 (1965)).  No longer a tool of the nobility, escheat remains today a significant legal process, though "the state [now] steps in the place of the feudal lord, by virtue of its sovereignty."  *Escheat*, Black's Law Dictionary (11th ed. 2019) (quoting James Kent, *Commentaries on American Law* *423-24 (George Comstock ed., 11th ed. 1866)); *see also Marathon Petroleum Corp. v. Sec'y of Fin.*, 876 F.3d 481, 485-86 (3d Cir. 2017) (quoting the same with approval).  Delaware, like every other state and the District of Columbia, "has a set of escheat laws, under which holders of abandoned property must turn such property over to the State 'to provide for the safekeeping of abandoned property and then to reunite the abandoned property with its owner.'" *Marathon Petroleum*, 876 F.3d at 488 (quoting *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 383 (3d Cir. 2012)).  When the rightful owner cannot be found, the property stays in the state's coffers.  "Such property thus escapes seizure by would-be possessors and is used for the general good rather than for the chance

4

enrichment of particular individuals or organizations." *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 436 (1951).

A great deal of the property subject to escheatment is intangible and could be subject to claims by more than one state.[1] The Supreme Court, in a line of cases dubbed the "*Texas* trilogy," has therefore established "a strict order of priority among states competing to escheat" abandoned intangible personal property. *Marathon Petroleum*, 876 F.3d at 484; *see also Texas v. New Jersey*, 379 U.S. 674 (1965); *Pennsylvania v. New York*, 407 U.S. 206 (1972); *Delaware v. New York*, 507 U.S. 490 (1993). That order of priority is as follows:

> First, we must determine the precise debtor-creditor[2] relationship as defined by the law that creates the property at issue.

---

[1] Such property typically exists in the form of "savings accounts, checking accounts, stocks, uncashed dividend or payroll checks, traveler's checks, unredeemed money orders or gift certificates, life insurance policies, etc." *Temple-Inland, Inc. v. Cook*, 192 F. Supp. 3d 527, 531 (D. Del 2016).

[2] In escheat parlance, the term "debtor" refers to the "holder" of the unclaimed property (or the person or entity that has possession of the property and that would be subject to a state's escheatment laws). *Marathon Petroleum Corp. v. Sec'y of Fin*, 876 F.3d 481, 489-90 (3d Cir. 2017). The term "creditor" refers to the "owner" of the unclaimed property (or the person who is entitled to the property). *Id.*

> Second, because the property interest in any debt belongs to the creditor rather than the debtor, the primary rule gives the first opportunity to escheat to the State of "the creditor's last known address as shown by the debtor's books and records."

> Finally, if the primary rule fails because the debtor's records disclose no address for a creditor or because the creditor's last known address is in a State whose laws do not provide for escheat, the secondary rule awards the right to escheat to the State in which the debtor is incorporated.

*Delaware*, 507 U.S. at 499-500 (citation omitted). In establishing that analytical framework, "the Supreme Court emphasized the importance of having bright-lines rules[,]" *Marathon Petroleum*, 876 F.3d at 491, and explicitly stated that "no State may supersede [the priority rules] by purporting to prescribe a different priority under state law."[3] *Delaware*, 507 U.S. at 500.

---

[3] Although the *Texas* trilogy focused on competing state escheatment claims and involved states as opposing parties, we have recognized that "the Supreme Court's precedent does permit a private cause of action to enforce the priority rules." *Marathon Petroleum*, 876 F.3d at 493, 494 ("It makes little sense to require a private party to wait to be sued by a state before that party can assert its rights. If private parties may be defendants in disputes over the priority rules when their interests are at stake, they by rights should also be allowed to

As a leading domicile for corporations, Delaware has taken full advantage of the *Texas* trilogy framework. *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 536 (3d Cir. 2017) ("[I]n recent years, state escheat laws have come under assault for being exploited to raise revenue rather than reunite abandoned property with its owners. Delaware's … [UPL] is no exception; … unclaimed property has become Delaware's third-largest source of revenue[.]"). Amended in 2017,[4] Delaware's UPL requires companies to report abandoned property to the state annually and authorizes an official called the "State Escheator" to, *inter alia*, enforce the UPL and "[e]xamine the records of a person or the records in the possession of an agent, representative, subsidiary, or affiliate of the person under examination in order to determine whether the person complied with [the escheat law]." Del. Code Ann. tit. 12, §§ 1144, 1171(1); *Marathon Petroleum*, 876 F.3d at 486 n.6. The State Escheator may also "[i]ssue an administrative subpoena to require that [any] records [requested] be made available for examination" and may "[b]ring an action in the Court of Chancery seeking enforcement of" such a subpoena. Del. Code Ann. tit. 12, § 1171(3), (4). The UPL imposes a

---

sue for enforcement of the priority rules to ensure protection of those same interests.").

[4] Delaware recently enacted further amendments to the UPL that do not affect our analysis. *See* 83 Del. Laws ch. 59, § 14 (2021). Except where noted, we cite to the 2017 version of the law.

records retention requirement,[5] *see id.* § 1145, and authorizes the use of "a reasonable method of estimation" to determine escheat liability if companies fail to keep the mandated records, *id.* § 1176(a). The statute further levies interest and penalties on those who fail to timely turn over unclaimed property, *id.* § 1183, though it allows the State Escheator to waive some costs in some situations, *see id.* § 1185, including when "the person under examination" elects to "expedite" the audit, *see id.* § 1172(c)(1).

If the audited party makes such an election, the "person conducting the examination," is required to make "[a]ll requests for records, testimony, and information" within eighteen months. *Id.* § 1172(c)(4). Additionally, if the party choosing an expedited audit "provides sufficient responses within the time and in the manner established by the State Escheator to all" such requests, the State Escheator is required to "complete the examination and provide an examination report within 2 years from the date of the acceptance of the request to expedite[.]" *Id.* § 1172(c)(3). Determining whether an expediting party has complied with its side of the bargain – and, if not, whether to terminate the expediting of the examination – is at the "complete discretion of the State Escheator and subject only to the review of the Secretary of Finance." *Id.* § 1172(c)(5).

---

[5] The UPL did not have a records retention requirement prior to the 2017 amendments.

8

### B.    Examination of Siemens[6]

The audit at issue in this case began many years before the 2017 UPL amendments.  On June 2, 2009, Siemens notified Delaware of its intent to submit a Voluntary Disclosure Agreement ("VDA") – a statutorily authorized tool for informing the state of an intent to comply with the UPL in exchange for certain limitations on liability and on the scope of an audit.  Four minutes later, the State Escheator rejected Siemens's request, stating that "Siemens has been selected for audit, therefore the VDA request is rejected."  (J.A. at 100 ¶ 87.)  The contention that the state's instantaneous denial was prohibited by Delaware's own law is woven into Siemens's narrative of the Defendants' alleged wrongdoings,[7] but that question is irrelevant for purposes of this appeal because the state and Siemens signed an agreement laying out a mutually satisfactory path forward for the audit.  That agreement granted Siemens some of the VDA's benefits, including a shortened look-back period and a potential waiver of interest and penalties, in exchange for Siemens's provision of "a substantial

---

[6] Because the District Court dismissed all but one of Siemens's claims on the face of the complaint and decided the motion for a preliminary injunction without reliance on the evidentiary record, *see infra* Section I.C., our summary of the facts is based on Siemens's complaint, except where noted.

[7] In 2009, Delaware regulations provided that "[a]ny Holder who wishes to comply with the Delaware Abandoned or Unclaimed Property Law may file a VDA."  9 Del. Reg. Regs. 1502, 1503 (Apr. 1, 2006).  A holder was barred from filing a VDA if it had "received an audit letter or [was] currently under audit by the State of Delaware[.]" *Id.*

advance deposit against audit liability." (J.A. at 101 ¶ 92.) If the advance were to ultimately exceed Siemens's liability, the remainder would be refunded; if materially short, however, Siemens would be subject to adverse consequences. Pursuant to that agreement, on October 31, 2009, Siemens paid Delaware a $7.4 million deposit.

Delaware delegated to Kelmar Associates, LLC ("Kelmar") – a familiar player in disputes involving Delaware's escheatment practices – the authority to conduct the Siemens audit.[8] The work covered seven entities and involved an eighteen-year look-back period.[9] That is, Kelmar requested the production of Siemens's records for periods

---

[8] Delaware has regularly retained Kelmar to conduct the state's audits on a contingent fee basis, which has resulted in "the Delaware Department of Finance pa[ying] Kelmar fees for auditing services in the amount of $53,494,091" for "fiscal [year] 2013 alone[.]" (J.A. at 102 ¶ 96; *see also id.* ¶ 97.) We have previously observed that "Kelmar's financial incentive to claim as much escheatable property as possible taints the entire process with an appearance of self-interested overreaching." *Marathon Petroleum*, 876 F.3d at 497.

[9] The audit may have covered eight entities. The number of identified entities is actually inconsistent between Siemens's complaint and its motion for preliminary injunction. That discrepancy is not relevant for purposes of this appeal, however, and we refer to all of the entities together under the Siemens name.

reaching back to 1991.[10] Siemens ultimately produced seven years of records, with two to five of those years later forming the "Base Period" for Kelmar's audit findings, depending on the account.[11] The then-State Escheator suggested that statistical sampling and estimation were an option to determine what the remaining "'historic' liability 'might' have been" since "there is a very large universe of data to be researched" and "there may be circumstances where adequate books and records do not exist" to determine exact liability. (J.A. at 103 ¶ 99, 291-92.) He further informed Siemens that "statistical sampling is an option that is *entirely at the request of the holder*" and followed that up with the caveat that "both Delaware and the Holder should be bound to the result," should Siemens "choose to pursue" the sampling option "and

---

[10] The look-back period was eventually shortened to begin at 1994, in accordance with the 2017 UPL amendments, which became effective February 2, 2017. *See Marathon Petroleum*, 876 F.3d at 486 n.6 (explaining that the 2017 amendments "limit[ed] the look-back period of all audits to ten years[.]" (citing S.B. 13, 149th Gen. Assemb. (Del. 2017))).

[11] The Base Period refers to a period for which records exist that is chosen to calculate the audited company's liability. *See* 12 Del. Admin. Code § 104.2.19.1 ("If for certain periods the amount of reportable property cannot be ascertained from the books and records of the Holder, projection techniques may be used to determine the reportable amounts for such periods. Such determination shall be made by first examining records during periods in which records exist to establish a "Base Period" of data from which statistical inferences can be made for periods in which records are incomplete or do not exist.").

Delaware agrees to it[.]"  (J.A. at 103 ¶ 99 (emphasis added), 292.)  Siemens rejected his suggestion.

Despite that, Kelmar conducted an estimation analysis anyway.  It created populations of presumed abandoned debts from checks and credits "from five years of records from sixteen accounts payable disbursements accounts, six payroll disbursements accounts, accounts receivable agings for four entities, and [one Siemens entity's] unapplied cash account for the purpose of estimating a liability, more than 9,000 items of which had owner addresses in other states."  (J.A. at 103 ¶ 101.)

In 2015, after Kelmar had received and reviewed voluminous records from Siemens, Siemens objected to Kelmar's use of an estimation methodology, particularly one with data that incorporated items with owner addresses in other states, since Siemens contends funds belonging to such owners are not escheatable to Delaware.  Delaware informed Siemens of its intent to continue using that estimation methodology even after the United States District Court for the District of Delaware ruled in *Temple-Inland, Inc. v. Cook* that the estimation methodology used there violated due process.  192 F. Supp. 3d 527, 550 (D. Del. 2016) ("To put the matter gently, defendants have engaged in a game of 'gotcha' that shocks the conscience.").

In December 2017, [12] pursuant to Delaware's then-recently enacted, "limited time offer" to expedite certain

_____

[12] Although Siemens points to a December 6, 2017, email as its declaration of intent to seek an expedited audit, an

examinations, *see* Del. Code Ann. tit. 12, § 1172(c), Siemens elected to expedite its audit.[13] (J.A. at 90-91 ¶¶ 57, 60.) At that point, Siemens alleges that it "had already responded to all

_____

attachment to the subsequently executed expedited audit examination form lists the date of notice of intent to expedite as December 11, 2017. (*Compare* J.A. at 260, 281 *with* J.A. at 264; *see also* J.A. at 277 (email from Siemens stating "[I]t is in Siemens'[s] best interests to conclude this audit as quickly as possible prior to December 11, 2019[.]").) That five-day difference has no effect on our analysis, and we leave it to the District Court to resolve any factual disputes, as necessary, on remand.

[13] The statute permitted any company whose "examination [was] authorized by the State Escheator before February 2, 2017" to elect an expedited examination if, by December 11, 2017, it provided written notification of its "intent to expedite the completion of the pending examination." Del. Code Ann. tit. 12, § 1172(c)(1) (2017), *amended by* Del. Code Ann. tit. 12, § 1172(c)(1) (2021). If written notification was provided in accordance with paragraph (c)(1) and the company "respond[ed] within the time and in the manner established by the State Escheator to all requests for records, testimony, and information made by the person conducting the examination," the State Escheator was obligated to "complete the examination and provide an examination report … within 2 years from the date of receipt of the written notification and … [also to] *waive interest and penalty* under §§ 1183 and 1184 of this title." *Id.* § 1172(c)(2) (2017) (emphasis added), *amended by* Del. Code Ann. tit. 12, § 1172(c)(2) (2021).

of Kelmar's information requests and w[as] in the 'defense' phase of the audit in which [the company was] researching to rebut the presumption of abandonment for populations of uncashed checks and customer credits … so [Siemens] believed [it] could easily satisfy the requirements of an expedited audit within the two-year deadline." (J.A. at 91-92 ¶ 60.) The State Escheator accepted Siemens's election on January 16, 2018. According to a written schedule attached to that acceptance, the "Defendants considered [Siemens's] audit to be in 'Phase III[,]'" which, again, Siemens contends is "the phase of the audit *after* the auditors have completed data collection[,]" when the company has "the opportunity to review, reconcile, remediate and perform remediation outreach on any items that have been identified as potential unclaimed property."[14] (J.A. at 105 ¶¶ 106-07 (quoting 12 Del. Admin. Code § 104-2.22.1), 264, 266, 274.) Siemens's complaint acknowledges that it limited its research and remediation

---

[14] According to the Defendants, "[r]emediation is a term of art that describes the process by which the holder researches property that is presumed unclaimed based on the holder's records." (Answering Br. at 11 n.6.) *See* 12 Del. Admin. Code §§ 104-2.17.6 ("During the pendency of the examination, if applicable and practicable, the Auditor shall provide to the Holder in writing … Explanation of the process used to determine that items are unclaimed property … Explanation of why documentation provided by Holder is not sufficient to remediate an item[.]"), 2.17.7 ("Holders shall be given the opportunity to review, reconcile, remediate and, where applicable under Delaware law, perform due diligence on any items that have been identified as potential unclaimed property."), 2.22.1 (same).

efforts to those "checks and customer credits over which [it believed] Delaware would have escheat jurisdiction under federal law[.]" (J.A. at 105 ¶ 108.)

Months later, on June 10, 2019, Kelmar provided Siemens with two Interim Status Reports, calculating the results of Siemens's remediation efforts with respect to two different audited entities. Both reports were based on Siemens's remediation efforts through June 7, 2019, and neither was a request for payment. One report calculated $22,406,758.17 of liability, of which $21,280,167.37 was an estimate, and the other calculated $17,788,691.36 of liability, of which $16,538,946.61 was an estimate. In other words, the audit reports "estimated an additional liability of $37.8 million to Delaware for 7 years where records did not exist based on checks and credits with owner addresses in other states from the 5 year[ ] [Base Period], many of which were not researchable." (J.A. at 432 (citing J.A. at 74 ¶ 2, 105-06 ¶¶ 109, 112).) That means that, under Kelmar's calculations in its interim reports, approximately 94% of the total unclaimed property Siemens was to turn over to Delaware consisted of an extrapolated guess.[15]

---

[15] To give an example, Kelmar identified "relatively few unreported abandoned checks with payee addresses in Delaware … or lacking an address[.]" (J.A. at 107 ¶ 116.) As alleged in the complaint, for one Siemens entity, Kelmar only identified "$161.41 of unreported aged checks with payee addresses in either Delaware ($83.19) or lacking an address ($78.27) (an average of $32.28/year)[.]" (J.A. at 107-108, ¶ 116.a.) "[Y]et Kelmar estimated a liability of $776,358.99 for five years where records did not exist (an average of

15

On July 15, 2019, Siemens alleges, it informed Delaware that it "had exhausted all efforts to remediate any further items, and requested a final report of examination and Statement of Findings and Request for Payment[.]" (J.A. at 106 ¶ 110.) By Siemens's telling, the Delaware State Escheator then threatened to terminate Siemens's expedited audit if it "did not remediate the remaining population items with owner addresses in other states, which she asserted consisted of at least 6,000 items." (J.A. at 106 ¶ 110.) The State Escheator again informed Siemens, on September 30, 2019, of its failure to perform required research on the "more than 6,000 'open' checks and credits to prove they were not abandoned property[.]" (J.A. at 449-50 (preliminary injunction evidentiary record).) Siemens did not challenge the nature of the property (i.e., its status as "abandoned"), but instead asserted that the State Escheator had no authority to require research of those items because "Delaware could not claim any of those items which all had addresses in states other than Delaware[,]" and "Siemens had already provided the payee and customer addresses to Delaware for each item." (J.A. at 450 (preliminary injunction evidentiary record).)

The parties' positions became further entrenched on October 7, 2019, when Siemens again requested the final examination report because it "had exhausted its efforts to

$155,271.80/year)." (J.A. at 108, ¶ 116.a.) Similar discrepancies exist between the actual sums of unclaimed property for years with records and the estimated liabilities for years without existing records for numerous entities and property types included in Kelmar's audit.

16

research all 'open' checks and credits with payee and/or customer addresses in Delaware, in a foreign country, and/or where the address was unknown." (J.A. at 450 (preliminary injunction evidentiary record).) The Secretary of Finance informed Siemens that "Delaware cannot provide a final examination report" until it has obtained the "additional research of checks and customer credits with owner addresses in other states to rebut against them being abandoned property[.]" (J.A. at 450 (preliminary injunction evidentiary record).) He also stated that "the Interim Status Reports show the liability calculation based on information Delaware received" and that "he did not know why the parties could not negotiate a settlement based on those reports." (J.A. at 450-51 (preliminary injunction evidentiary record).)

Later, on November 4, 2019, the Secretary of Finance told Siemens "that Delaware is not obligated to issue a final examination report and that doing so would allow Siemens to use the expedited audit process as a vehicle for litigation. [He] asked Siemens for a settlement offer to 'advance the ball' and indicated that" the state would not change its estimation methodology. (J.A. at 451 (preliminary injunction evidentiary record).) Siemens rejected the Secretary's suggestion and the Defendants subsequently terminated Siemens's expedited audit on December 11, 2019. That termination reverted Siemens's audit to the ordinary examination program, putting interest and penalties back on the table.[16] The commencement of this lawsuit followed on December 17, 2019.

---

[16] It is unclear whether the termination of the expedited audit also reinstated the parties' 2009 agreement that originally governed the Siemens audit and granted Siemens a potential

## C.     Procedural Background

Siemens's complaint seeks declaratory and injunctive relief on the basis of four claims. First and foremost, Siemens contends that Delaware's escheat laws are preempted by the *Texas* trilogy (Count I). Specifically, Siemens alleges that there is no circumstance under which Delaware may claim all open items, given the *Texas* trilogy's rules of priority. As a result, because Siemens already provided Delaware with the records establishing out-of-state owner addresses for all open items, Delaware has no authority to obtain any other records regarding those open items. In addition, Siemens alleges Fourteenth Amendment substantive due process violations (Count II), Fourteenth Amendment procedural due process violations (Count III), and Fourth Amendment search or seizure violations (Count IV).[17]

Looking particularly at Count III, Siemens argues that the following conduct by the Defendants violated its right to procedural due process:

- "Defendants refuse[d] to conclude [Siemens's] audit by the statutory deadline, thereby subjecting [Siemens] to

waiver of interest and penalties. But we assume it did not, as Siemens alleges that it now faces the statutorily mandated accumulation of interest and penalties during the ongoing audit.

[17] The District Court found it unclear whether Siemens alleged an unreasonable search or seizure, so it considered both in its decision to dismiss that claim.

18

mandatory interest and penalties. However, the UPL does not provide for pre-compliance review by a neutral arbiter and thus [Siemens was] denied the opportunity to defend against the refusal to terminate their audit and the loss of the associated benefits. The Secretary rubber-stamped the State Escheator's decision, but [Siemens was] not afforded an opportunity to present [its] case to the Secretary." (J.A. at 119 ¶ 166.)

- "Defendants rely on the use of contingent fee auditors whose financial self-interest influences the conduct and results of the audit." (J.A. at 119 ¶ 167.)

- "Kelmar selected the populations to which to apply the presumption of abandonment for research (including items that could not [be] researched due to a lack of records), made evidentiary determinations, and calculated estimated liabilities." (J.A. at 119 ¶ 168.)

Siemens asserts similar allegations in support of Count II, its substantive due process claim. It emphasizes again the Defendants' problematic "use of estimation and reliance on records that are not researchable[,]" (J.A. at 117 ¶ 153,) and their reliance "on the use of contingent fee auditors whose financial self-interest influences the conduct and results of the audit." (J.A. at 118 ¶ 161.) Lastly, as to Count IV, Siemens alleges that the Defendants' audit process amounted to an unreasonable search or seizure because the state was holding hostage its final audit report, thereby increasing the accumulation of interest and penalties, until Siemens remediated the remaining 6,000 open items.

The Defendants moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6), arguing that Siemens's claims were unripe and that Siemens failed to state a claim. The Defendants also raised issues of abstention and comity.

Then, approximately four months after the lawsuit began and while the motion to dismiss was still pending, the Defendants sent Siemens a letter stating that "Siemens remains in the standard examination process" and that "the State remains committed to completing [that] examination in a reasonable and timely manner." (J.A. at 646.) Attached to that letter was "a consolidated schedule of the current open items requiring research and remediation[,]" suggesting that remediation was necessary "to move the examination forward." (J.A. at 646.) In response, Siemens filed a motion for preliminary injunction. It contended that the open items were for checks and credits that it "had been unable to remediate due to a lack of records or … were not necessary to research to determinate a liability to Delaware because they have addresses outside of Delaware." (J.A. at 433.) Stated differently, Siemens argued that the "Defendants have already identified the most property Delaware can claim and [Siemens] ha[s] exhausted [its] efforts to rebut any presumption of abandonments with respect to that property." (J.A. at 428.) So, according to Siemens, the "only purpose for continuing to audit is to pressure [Siemens] to accept an inflated monetary settlement to end it and to prevent [Siemens] from re-litigating the conduct in *Temple-Inland Inc v. Cook*[.]" (J.A. at 428-29.) On that basis, Siemens sought "to enjoin [the] Defendants from enforcing the audit, judicially or otherwise, outside this lawsuit until a final ruling on the merits of [Siemens's] claims." (J.A. at 429.)

The District Court addressed the Defendants' motion to dismiss and Siemens's motion for a preliminary injunction in one opinion. It dismissed all claims against the State of Delaware, with prejudice, on the basis of sovereign immunity. It further dismissed, without prejudice, the preemption claim (Count I) and the substantive due process claim (Count II) as unripe and the Fourth Amendment claim (Count IV) for failure to state a claim. As for the procedural due process claim (Count III), the Court declined to dismiss the portion of it based on the use of a self-interested third-party auditor but dismissed, without prejudice, the portion based on the termination of the expedited audit without pre-enforcement review. Turning to the motion for preliminary injunction on Siemens's sole surviving claim – the "procedural due process claim[] for use of self-interested third-party auditors" – the Court held that Siemens had failed to establish that it would suffer irreparable injury absent an injunction. (J.A. at 54-61.) Siemens has timely appealed.

## II.   DISCUSSION

Siemens challenges the District Court's denial of a preliminary injunction, contending that the Court's irreparable injury analysis erroneously applied our precedent. Using the denial of preliminary relief as a jurisdictional hook, Siemens further argues that we may – and should – exercise pendent jurisdiction to review and reverse the District Court's dismissal of the preemption claim and the expedited-audit procedural due process claim. For the reasons that follow, we agree that the District Court erred when it concluded that Siemens would not suffer irreparable injury absent a preliminary injunction. And because review of the underlying dismissal of Siemens's preemption and procedural due process claims is necessary to

21

meaningfully review the denial of the request for a preliminary injunction, we will exercise pendent jurisdiction to review the challenged dismissals.[18]  While we ultimately agree that the District Court erred in dismissing the preemption claim as unripe, we decline to rule on the merits of that claim until there has been further development of the evidentiary record.  Finally, we will affirm the District Court's dismissal of the expedited-audit procedural due process claim for failure to state a claim.

## A.    Irreparable injury

We begin with the question that indisputably allows Siemens to bring this interlocutory appeal:[19] Did the District

---

[18] On appeal, Siemens does not challenge the District Court's dismissal of all claims against the State of Delaware on the basis of sovereign immunity or the dismissal of its Fourth Amendment claim.  And, although the District Court dismissed the preemption and substantive due process claims as unripe in one combined analysis, Siemens does not challenge the dismissal of the substantive due process claims.

[19] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 2201, and 2202.  We have jurisdiction to review the District Court's order denying preliminary injunctive relief under 28 U.S.C. § 1292(a)(1).  "In reviewing a preliminary-injunction order, findings of fact are assessed for clear error, legal conclusions are reviewed de novo, and the ultimate decision to grant relief is reviewed for abuse of discretion." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 130 (3d Cir. 2017); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d

Court err in denying Siemens's motion for a preliminary injunction for lack of irreparable harm? The answer is yes.

A motion for preliminary injunctive relief requires a district court to consider the following four factors:

> (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

*Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 352 (3d Cir. 2003) (citations omitted). When it comes to the second factor, irreparable harm, "[t]he law ... is clear in this Circuit: In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (internal quotation marks and citation omitted). Additionally, "[t]he 'requisite feared injury or harm must be irreparable – not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot

700, 708 (3d Cir. 2004) ("Despite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge[,] whose decisions will be reversed only for 'abuse,' a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law." (citation omitted)).

23

atone for it.'" *Id.* at 91-92 (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)).

In assessing the alleged irreparable harm in this case, the District Court was guided by our decision in *New Jersey Retail Merchants Association v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012), which similarly considered a challenge to the constitutionality of an unclaimed property statute. The plaintiffs in that case objected to a New Jersey statute and filed motions for a preliminary injunction to prevent the state from enforcing it. They argued that it violated the Supremacy Clause by including a "place-of-purchase presumption."[20] *Id.* at 382, 385. The district court granted, and we affirmed, their requests to preliminarily enjoin the prospective enforcement of the statute's place-of-purchase presumption and the regulatory guidance elaborating on that presumption. *Id.* at 384-85, 395-96. In affirming, we concluded that the plaintiff-companies

_____

[20] The "place-of-purchase presumption" referred to the following provision of the challenged statute:

> If the issuer of a stored value card does not have the name and address of the purchaser or owner of the stored value card, the address of the owner or purchaser of the stored value card shall assume the address of the place where the stored value card was purchased or issued and shall be reported to New Jersey if the place of business where the stored value card was sold or issued is located in New Jersey.

*N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 384 (3d Cir. 2012) (quoting N.J. Stat. Ann. § 46:30B–42.1c (2010)).

24

would suffer irreparable harm absent the issuance of a preliminary injunction. We reasoned that they "must either face prosecution and fines for noncompliance or turn over, in cash, the remaining value of existing gift cards that have not been redeemed within two years[,]" i.e., the amount presumed abandoned under the statute, and that "[t]hey would not be entitled to receive those funds back if [the challenged statute was] later found to be unconstitutional, due to state sovereign immunity." *Id.* at 388; *see also id.* at 396.

That dilemma and the resulting inability to later demand a refund were premised on the prospect of New Jersey's enforcement of the challenged statute. *Id.* at 388 ("If the State enforces Chapter 25, SVC Issuers must either face prosecution and fines for noncompliance or turn over, in cash, the remaining value of existing gift cards that have not been redeemed within two years."). Here, the existence of irreparable harm is even clearer because the enforcement of Delaware's statute is not prospective; it is actual and ongoing. Siemens is under audit and has been for over a decade.[21] Although the District Court considered our decision in *New Jersey Retail Merchants* in its irreparable injury determination, it held that any noncompliance costs are contingent on the "completion of the audits, which has not occurred" and which "there is no indication" will occur "imminently." (J.A. at 57-58.) On that basis, the District Court concluded that, "in

_____

[21] For the same reason, Siemens has standing to sue, which the Defendants do not dispute. The imminence of enforcement may be an issue in certain cases with respect to the ripeness of a claim, but that too is not an issue here, for the reasons explained *infra* at Section II.C.

25

contrast to the plaintiffs in *N.J. Retail*, … [Siemens] [is] not currently in the position of having to choose between prosecution or fines for noncompliance versus turning over, at or by a set date, funds which they cannot recover even if they succeed on the merits due to state sovereign immunity." (J.A. at 58 (citation omitted).) That conclusion, however, fails to take account of the statutorily mandated accumulation of interest and penalties during the ongoing audit, *regardless* of any specific demand for payment by the Defendants.

The Delaware UPL expressly mandates that "[a] holder of property presumed abandoned and subject to the custody of the State Escheator shall file an annual report to the State Escheator concerning the property[,]" Del. Code Ann. tit. 12, § 1142, and "on filing a report under § 1142 … the holder shall [then] pay or deliver to the State Escheator the property described in the report." *Id.* § 1152. That payment requirement attaches interest and penalties unless the State Escheator specifically waives payment or utilizes the expedited examination process to demand payment. In fact, under title 12, section 1183(a) of the Delaware Code, the interest and penalties begin accumulating automatically "from the date the amounts or property were due … until paid." In other words, that accumulation does not begin on the date the state demands payment or the date it submits a final report to Siemens; the accumulation begins after the property is statutorily presumed abandoned, which is when the annual report for that property was due. *See id.* §§ 1142, 1152, 1183; *see also id.* § 1144(d) (acknowledging that the State Escheator may grant an extension to file a report under § 1142 for good cause; explaining that, if an extension is granted, a holder's "payment or partial payment" of the estimated amount that "ultimately will be due" will terminate the "accrual of interest on the

26

amount paid"). And the state can collect, in interest, up to "50% of the amount required to be paid[,]" with that interest accruing "at 0.5% per month on outstanding unpaid amounts" from that due date, in addition to collecting overlapping, similar penalties for payment or report submission delays. *Id.* § 1183. Thus, in considering the audit, the District Court paid insufficient heed to a holder's payment obligations under the statute and the consequences of not meeting those obligations.

The District Court instead focused on what it viewed as the speculative and contingent nature of the audit's completion. But even if enforcement of the UPL in this case could rightly be viewed as speculative, *New Jersey Retail Merchants* suggests that contingency does not prevent a finding of irreparable injury.[22] Indeed, that case did not arise from an audit or any specific dispute between a company and the state.

---

[22] That does not mean any speculative harm can constitute irreparable harm. *Compare Ohio Oil v. Conway*, 279 U.S. 813, 814 (1929) (referring to irreparable injury that is "certain"), *with Brown v. Chote*, 411 U.S. 452, 456 (1973) (referring to the "possibility that irreparable injury would have resulted"), *and Granny Goose Foods v. Bhd. of Teamsters*, 415 U.S. 423, 441 (1974) (measuring "likelihood" of irreparable injury). But, in an instance like this, the irreparability of the harm can be measured even prior to enforcement. Siemens's choice between risking fines for nonpayment and paying non-refundable money to avoid the potential enforcement of fines is very real right now, after it has spent more than a decade in a contentious audit process with Delaware and has lost the protection against incurring interest and penalties it had as part of the expedited audit.

27

It arose from a challenge to an escheatment law that the plaintiffs contended was unenforceable on its face. Yet we agreed there was irreparable injury, despite the statute not yet having been enforced against the plaintiffs. *N.J. Retail Merchs. Ass'n*, 669 F.3d at 386, 388. The case before us now presents an even stronger case for acknowledging such harm. Whether through the completion of an actual audit or Siemens's independent duty to make payments, Siemens is faced with a similar decision as the one at issue in *New Jersey Retail Merchants* – between prosecution and fines for noncompliance or turning over irretrievable cash for property that the state, through its self-interested third-party auditor, may have impermissibly categorized as abandoned and escheatable to Delaware. There is a real, and no doubt intended, in-terrorem effect to the escalating penalties provided for in the statute, whether or not the penalties have been finally assessed as due and owing. The threat of penalties is meant to push companies to comply, and that threat could constitute an injury in itself. The District Court thus erroneously applied our precedent in *New Jersey Retail Merchants*.

A flawed irreparable harm analysis does not, however, automatically mean that the correct application of the rule from *New Jersey Retail Merchants* would require a finding of irreparable harm in this case. The existence and magnitude of the penalties Siemens faces does not appear in the record, although there is reason to believe it is commensurate with the millions of dollars in liability reflected in Kelmar's interim reports. Because the matter must in any event be remanded to address the erroneous dismissal of the preemption claim as unripe, *see infra* Section II.C, we will leave it to the District

28

Court to consider whether Siemens has actually established irreparable harm on the basis of its surviving claims.[23]

### B. Jurisdiction over the dismissal of the preemption and procedural due process claims

Siemens next asks us to go a step further and review the District Court's dismissal of its preemption and expedited-audit procedural due process claims. The Defendants contest our authority to do so, arguing that "Siemens'[s] baseless

---

[23] To aid in that determination, we note that the District Court was correct when it rejected Siemens's contention that "a likelihood for success on the merits of a procedural due process claim alone is sufficient in the Third Circuit to satisfy the 'irreparable harm' inquiry." (J.A. at 60.) Our precedent makes clear that:

> In order to obtain a preliminary injunction, plaintiffs must show both (1) that they are likely to experience irreparable harm without an injunction and (2) that they are reasonably likely to succeed on the merits. A court may not grant this kind of injunctive relief without satisfying th[o]se requirements, regardless of what the equities seem to require.

*Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000); *see also Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90-91 (3d Cir. 1992) ("[T]o support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm." (citation omitted)).

motion for a preliminary injunction should not be permitted to serve as a Trojan Horse to secure appellate review of interlocutory orders." (Answering Br. at 31.) Because Siemens sought injunctive relief on the basis of all of its claims, and because the Court ended its consideration of whether injunctive relief was warranted on the preemption and expedited-audit procedural due process claims after dismissing them, it is appropriate to review those rulings to ensure meaningful review of the appealable order. Accordingly, we will exercise pendent jurisdiction.

"The doctrine of pendent appellate jurisdiction, in its broadest formulation, allows an appellate court in its discretion to exercise jurisdiction over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its jurisdiction." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 202-03 (3d Cir. 2001). A "narrow" exception to be used "sparingly[,]" pendent appellate jurisdiction is properly exercised to review "inextricably intertwined orders" or when "review of the non-appealable order … is necessary to ensure meaningful review of the appealable order." *Id.* at 203; *see also O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 765 (3d Cir. 2021) ("Simply put, if we can adjudicate the appealable order 'without venturing into otherwise nonreviewable matters, we have no need – and therefore no power – to examine' those matters." (citation omitted)).

We have previously recognized that when a district court relies on the dismissal of a claim in denying a preliminary injunction, we may exercise pendent jurisdiction to review the dismissal and thereby give full review to the denial of the

30

preliminary injunction. In *Allegheny County Sanitary Authority v. United States Environmental Protection Agency*, the district court dismissed all but one of the claims in ruling on a motion to dismiss and then denied a preliminary injunction because the plaintiff was not likely to succeed on the merits of the remaining claim. 732 F.2d 1167, 1172-73 (3d Cir. 1984). On appeal from the denial of the preliminary injunction, we exercised pendent jurisdiction over the motion to dismiss because "resolution of [the preliminary injunction] depends to some extent on the correctness of the district court's dismissal." *Id.* at 1173. We reasoned that "it is not possible to separate the issue" because "[i]n ruling on the preliminary injunction, the court did not consider the likelihood of success on the [claim that] had been dismissed[,]" and thus "if the court erred in [deciding the motion to dismiss], the denial of the preliminary injunction might be called into question." *Id.*

The dismissals of the preemption and expedited-audit procedural due process claims here are analogous to the dismissal of the claim in *Allegheny County*, and therefore an exercise of pendent jurisdiction over them is warranted to ensure meaningful review of the District Court's denial of Siemens's motion for a preliminary injunction. The Defendants' arguments to the contrary are unpersuasive. They attempt to distinguish *Allegheny County*, saying that, unlike the denial of injunctive relief in that case, which was based on a failure to show "likelihood of success" on the merits, the merits of Siemens's claims "had no bearing on the District Court's injunction decision." (Answering Br. at 32-33.) According to the Defendants, the District Court "would have reached the same result even if it had not dismissed" the federal preemption claim. (Answering Br. at 33.) But there is absolutely nothing in the record to support that assertion, even if the Defendants

31

were correct in saying that the reasoning in *Allegheny County* depended on the "likelihood of success" factor being in play. And in our view, that premise is false. The other preliminary injunction factors matter. As discussed above, the District Court's application of *New Jersey Retail Merchants*, and consequently its irreparable injury determination, were erroneous. *See supra* Section II.A. We therefore rightly can, and will, exercise pendent jurisdiction over the preemption and expedited-audit procedural due process claims.[24]

---

[24] Even absent pendent jurisdiction, review of the District Court's dismissals may be proper pursuant to 28 U.S.C. § 1292(a)(1) because Siemens explicitly requested a preliminary injunction on the basis of all of its claims, and the Court's single, combined order dismissing some of Siemens's claims prior to consideration of the motion for preliminary injunction had "the same effect as an express refusal" to grant the injunction. *See* 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3924.1 (3d ed. 2021) ("Refusal of an explicit request for a preliminary injunction need not be express. … Appeals have been allowed from orders dismissing a count of the complaint seeking preliminary and permanent injunctive relief[.]"); *see also Valenti v. Mitchell*, 962 F.2d 288, 295 (3d Cir. 1992) ("When a claim seeking injunctive relief is dismissed on jurisdictional grounds, it has the effect of denying the ultimate equitable relief sought by the claimant, and the order is appealable under section 1292(a)(1).").

### C.     Ripeness of the preemption claim

With jurisdiction established, we consider whether the District Court erred in dismissing Siemens's preemption claim as unripe.[25]  Siemens argues that the claim is ripe because the Defendants' authority to conduct audits of checks and credits with owner addresses in other states is limited to records confirming the owners' out-of-state addresses, and any further attempt to audit such records is preempted by the priority rules of escheatment.  Accepting, as we must, all of Siemens's well-pled allegations when reviewing a motion to dismiss, we agree that the District Court prematurely dismissed the preemption claim as unripe.

At its core, "[t]he ripeness doctrine serves to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004) (internal quotation marks and citation omitted).  The purpose of the ripeness doctrine "is to prevent the courts … from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative

---

[25] "We exercise plenary review over … a district court's dismissal for lack of ripeness[.]" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 538 (3d Cir. 2017).  "Where, as here, the defendants move to dismiss a complaint under Rule 12(b)(1) for failure to allege subject matter jurisdiction, we treat the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Id.*

decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *accord Plains*, 866 F.3d at 539.

While the "contours of the ripeness doctrine are particularly difficult to define with precision whe[re, as here,] a party seeks a declaratory judgment," we are guided by three key factors: "the adversity of the interest of the parties, the conclusiveness of the judicial judgment[,] and the practical help, or utility, of that judgment."[26] *Marathon Petroleum*, 876 F.3d at 496 (second alteration in original) (internal quotation marks and citations omitted); *see also NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir. 2001) (describing ripeness as "a matter of degree whose threshold is

---

[26] The first factor, the adversity of interests, asks us to consider whether "the claim involves uncertain and contingent events, or presents a real and substantial threat of harm," the former being likely unripe and the latter likely ripe. *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 342 n.9 (3d Cir. 2001). Under the conclusiveness factor we consider whether "issues are purely legal (as against factual)," in which case they are likely ripe, or whether "further factual development would be useful," in which case they may be unripe. *Id.* Finally, the practical utility factor requires us to consider the "[h]ardship to the parties of withholding" judgment or whether "the claim involves uncertain and contingent events." *Id.* Again, the more real and immediate the harm, or the less contingent it is, the more likely the case is to be ripe for decision.

notoriously hard to pinpoint"). When assessing those three considerations in the context of escheat challenges, we have differentiated between two types of claims. The first are challenges to the scope of an escheat audit, which may not be ripe until the state formally demands compliance with the audit or makes a final determination. *See Marathon Petroleum*, 876 F.3d at 496-97 (holding that a claim focusing on the scope and intensity of the audit would not be ripe because "[t]he [plaintiffs'] challenge is predicated on the speculative assumption that Delaware will ultimately attempt to escheat property that it is not entitled to escheat"); *Plains*, 866 F.3d at 542 ("[Plaintiff] does not argue that Delaware lacks the authority to conduct its audit; rather, [plaintiff's] preemption claim is directed at the statute's estimation provisions. And[,] … Kelmar's audit has not yet begun[.]"). That is so because, prior to the conclusion of an audit, a scope challenge may well have within it jurisdiction-defeating problems related to each of the three ripeness factors. It may lack adversity because the alleged harms of an incorrect outcome or an illegal methodology are uncertain (i.e., it is still unknown whether the state will actually reach an erroneous calculation or employ an unlawful method). *Marathon Petroleum*, 876 F.3d at 497; *Plains*, 866 F.3d at 541. It may lack conclusiveness because, even when the issue is a facial challenge to a state statutory provision, further factual development may be useful to understand how the statute is interpreted and put into operation by the state whose law it is. *Plains*, 866 F.3d at 543. And, finally, assuming the suspension of penalties and interest, the suit may lack practical utility because the state's calculation of unclaimed property liability using a challenged methodology does not necessarily require any further action from the audited company, and thus the audited company may suffer no

hardship by waiting until the audit is complete to bring the claim. *Id.* at 544.

The second type of escheat challenge is to a state's auditing authority. That type has better odds of being ripe before an audit is complete. *See Marathon Petroleum*, 876 F.3d at 499. Anchoring our analysis again to the three ripeness factors, we have held there is sufficient adversity in an auditing-authority challenge when a state has actually requested information and the request is itself the claimed harm (i.e., the challenged actions of the state during the audit have already occurred). *Id.* at 498-99; *NE Hub*, 239 F.3d at 343-44. We have said conclusiveness exists because a holding that the state lacks authority to use a challenged audit process is a legal determination that would definitively determine the parties' rights with respect to the continuation of the challenged process. *Marathon Petroleum*, 876 F.3d at 498-99; *NE Hub*, 239 F.3d at 344. And we have also said practical utility exists if a ruling clarifies the parties' rights with respect to the continuation of the audit and would inform the parties' decisions about compliance and enforcement. *Marathon Petroleum*, 876 F.3d at 498-99.

Here, the District Court viewed Siemens's preemption claim as a scope challenge and held that there was a lack of adversity, and so a ripeness problem, because the Defendants had yet to conclude their audit. (J.A. at 31-33 ("[Siemens] do[es] not, however, challenge [the] Defendants' authority to audit them generally or [the] Defendants' authority to audit any of their entities. In other words, like the plaintiff in *Plains* but unlike those in *Marathon*, [Siemens] challenge[s] only the scope of the audit to which [it] may be subjected, not whether [it] may be subject to any unclaimed property audit 'at

36

all.'").)[27] Affording Siemens all "favorable inferences to be drawn from the complaint[,]" *NE Hub*, 239 F.3d at 341, and recognizing that the distinction between scope and authority challenges may at times be very thin, we disagree with the District Court and read Siemens's complaint as a challenge to the Defendants' audit authority as well.

Put simply, Siemens's preemption claim alleges that after an eleven-year saga, it has provided all records necessary for the Defendants to determine whether they may escheat property pursuant to the *Texas* trilogy. Nevertheless, says Siemens, in an attempt to inflate the amount owed to Delaware and to pressure Siemens into a settlement, the Defendants have refused to issue a final report unless they get additional information on property that is not escheatable to Delaware under federal common law. In other words, according to Siemens, "no further *legitimate* auditing can change the liability to Delaware" because "Kelmar already identified all potential abandoned property and because Siemens'[s] records showed owner addresses in other states, [so] 'the audit is effectively at an end.'" (Opening Br. at 39 (quoting *Marathon*

---

[27] The District Court did acknowledge that Siemens "challenge[s] [the] Defendants' *authority to audit certain of their records* and to use those records as a basis for an estimation." (J.A. at 33 (emphasis added).) Indeed, before the District Court Siemens argued that it was "challeng[ing] [the] Defendants' authority to audit property Delaware cannot claim under federal law[.]" (J.A. at 334; *see also* J.A. at 338 ("Here, Plaintiffs challenge Defendants' authority to audit 6,000 checks and credits Delaware cannot claim under the *Texas* Trilogy.").)

37

*Petroleum*, 876 F.3d at 499).)   Accepting that allegation as true, the preemption claim is ripe.   "When the claimed injury 'is the process itself,' in the manner it is here, then the interests of the parties are clearly adverse."  *Marathon Petroleum*, 876 F.3d at 499 (citation omitted).   The conclusiveness and practical utility considerations likewise weigh in favor of ripeness because any judgment issued on Siemens's preemption claim "definitively would decide the parties' rights" and would inform the parties' decisions about compliance and enforcement.  *NE Hub*, 239 F.3d at 344.

To the extent that Siemens's preemption claim presents an objection to the Defendants' use of estimation, something that has arisen in a previous scope challenge, *Plains*, 866 F.3d at 540-41, that aspect of the claim is here part and parcel of the audit-authority challenge too.  The Defendants acknowledge that they have "asked Siemens to research and remediate property that is not escheatable to Delaware under the *Texas* priority rules … so the State may reasonably and lawfully estimate property escheatable to Delaware for years in which Siemens has no records."  (Answering Br. at 53.)   Because Siemens has at least arguably already complied to the fullest extent Delaware can require of it under the *Texas* trilogy, the harm Siemens seeks to avoid is an unlawful extension of the audit process itself. [28]   That the Defendants' reason for

---

[28] *See* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.16 (3d ed. 2020) ("The most promising approach to defining the 'claim' in determining the scope of standing may be to begin with injury in fact, the core element of Article III standing theory.  Once a party is properly in court to challenge a particular injury-

38

extending the audit may end up defeating Siemens's preemption claim does not change the prevailing nature of that claim. Accordingly, because the preemption claim satisfies the ripeness requirements, we will vacate the District Court's dismissal of that count.

### D. Failure to state a procedural due process claim based on the lack of review before termination of the expedited audit

We next consider whether the District Court properly dismissed the claim that the Defendants violated Siemens's Fourteenth Amendment procedural due process rights when they terminated their expedited examination of Siemens's records even though there had been no "pre-compliance review by a neutral arbiter[.]"[29] (J.A. at 119.) The District Court held

---

causing event, the range of permissible argument may properly be measured by prudential concerns. The court need not consider arguments that are not suitable for reasons similar to ripeness analysis. … But the court should be free to consider the arguments that seem to provide the most secure basis for decision without undue concern for the conceptual nexus between argument and injury.").

[29] Again, Siemens's complaint alleges that:

Defendants refuse to conclude Plaintiffs' audit by the statutory deadline, thereby subjecting Plaintiffs to mandatory interest and penalties. However, the UPL does not provide for pre-compliance review by a neutral arbiter and thus Plaintiffs were denied the opportunity to defend

that Siemens failed to state a claim because the benefit of an expedited review is not a protected entitlement over which Siemens may assert it has rights.[30]  Instead, the Court noted, the State Escheator and Secretary of Finance are by statute explicitly afforded "complete discretion" to terminate the expedited proceedings.  (J.A. at 49.)  We agree and will therefore affirm the dismissal of that claim.

"The Fourteenth Amendment protects against deprivation of an individual interest in property without the due process of law."  *McKinney v. Univ. of Pittsburgh*, 915 F.3d 956, 960 (3d Cir. 2019) (alterations omitted) (internal quotation marks and citations omitted).  "Core to the existence of an individual property interest is the requirement that the plaintiff have 'a legitimate claim of entitlement to' the interest at issue that stems from 'an independent source such as state law' or 'rules or understandings that secure certain benefits.'"  *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  The Supreme Court has made clear "that a

against the refusal to terminate their audit and the loss of the associated benefits.  The Secretary rubber-stamped the State Escheator's decision, but Plaintiffs were not afforded an opportunity to present their case to the Secretary.

(J.A. at 119.)

[30] "We exercise plenary review over a district court's grant of a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim."  *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 299 (3d Cir. 2020).

benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock*, 545 U.S. at 756.

Here, Siemens's alleged property interest stems from Delaware's UPL. While that statutory scheme does provide to a holder an expedited examination if the holder "responds within the time and in the manner established by the State Escheator to all requests for records, testimony, and information made by the person conducting the examination," Del. Code Ann. tit. 12, § 1172(c)(2), it also makes clear that granting any such review is effectively within the State Escheator's discretion. Section 1172(c)(2)'s mandatory language – requiring the State Escheator to complete and provide an examination report within two years, in addition to waiving interest and penalties – is conditioned on the time and manner of the property holder's response. And those time and manner conditions are both established and evaluated by the State Escheator. *Id.* § 1172(c)(2), (c)(4). In the language of the statute, the determination of whether the holder has met the conditions "*shall* be within the *complete discretion* of the State Escheator and subject *only* to the review of the Secretary of Finance." *Id.* § 1172(c)(4) (emphases added). Moreover, any "resulting determination to terminate expediting the [holder's] examination" if the holder has not met that condition is equally within the State Escheator's "complete discretion[,] … subject only to the review of the Secretary of Finance." *Id.* Taken together, those limitations make clear that the state has reserved to its officers broad discretion to expedite the examination process, or not, thereby undermining Siemens's claim to a constitutionally protected property interest. *See Tundo v. County of Passaic*, 923 F.3d 283, 287 (3d Cir. 2019) (stating that a plaintiff has "no protected interest in a benefit if

41

the government has ample discretion to deny that benefit" where that discretion is "enough that there is no mutually explicit understanding that the benefit will continue").

Despite the clear text of section 1172(c), Siemens insists that it held a "property interest in an expedited audit that would conclude by December 6, 2019 and waive interest and penalties" because "the only determination over which the State Escheator has discretion" is whether Siemens responded to "information requests during the expedited audit in the 'time and manner requested[.]'" (Opening Br. at 48 (emphasis omitted) (quoting Del. Code Ann. tit. 12, § 1172(c)(2)).) According to Siemens, that single factual condition had already been met before it elected to expedite the examination because "Siemens had already answered all [of the] requests" relevant to the State Escheator's discretion. (Opening Br. at 49.) In Siemens's view, the "Defendants shoehorned into that UPL provision Siemens'[s] refusal to defend [itself] concerning items outside [the] Defendants' legal authority." (Opening Br. at 49 (emphasis omitted).) But even accepting the well-pled facts of the complaint, as we must when reviewing a motion to dismiss, it is clear that the UPL reserves to the discretion of the State Escheator the determination of whether an audited party has responded to all of the state's requests in the time and manner requested. *See* Del. Code Ann. tit. 12, § 1172(c)(4). Consequently, Siemens's attempt to allege a constitutionally protected property right fails as a matter of law and so does its procedural due process claim arising from the termination of the expedited audit. *See Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) (noting that a substantive interest must be at issue to raise any due process claims because "[p]rocess is not an end in itself" but instead has a "constitutional purpose … to protect

42

a substantive interest to which the individual has a legitimate claim of entitlement" (citation omitted)).

### E. Further development of the evidentiary record concerning the preemption claim

Finally, Siemens asks us to decide its preemption claim on the merits and remand for entry of a permanent injunction. We decline to do so because further development of the evidentiary record is needed. It is true that, "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction." *OFC Comm Baseball v. Markell*, 579 F.3d 293, 299 (3d Cir. 2009) (quoting *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 757 (1986)). But that is not the situation we are faced with here. The parties vigorously dispute whether Siemens has provided the Defendants with sufficient information to calculate Siemens's obligation under the UPL. (*See* Oral Arg. Tr. at 19 (Q: "[S]o when [Siemens] says, we gave them … [everything they need] [it's] just flat wrong?" A: "It's incorrect, Your Honor."), 21 ("[I]f the state were to answer today, many of the allegations in the complaint would be met with denials.").) And although preemption is a legal issue, we cannot say with certainty whether Siemens is entitled to declaratory and injunctive relief absent a more complete understanding of the manner in which Delaware has been conducting the audit, including what information they have, what information they are seeking, and why they are seeking

it.[31] *Cf.* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3532.6 (3d ed. 2021) ("The factors that weigh against review of incomplete agency proceedings are even more pronounced if a federal court is asked to interfere with a state agency. In this setting, challenges based on anticipated agency action should be treated with special skepticism."). Because we cannot glean such an understanding from the existing evidentiary record offered in support of the motion for a preliminary injunction, we will remand the case to the District Court for further proceedings.

We do, however, take note that the parties' dispute is based, at least in part, on competing interpretations of the *Texas* trilogy, and so endeavor to resolve that legal issue now. At oral argument, Siemens asserted that the last portion of the *Texas* trilogy framework – the portion that gives priority to the state of the debtor's incorporation when the creditor's last known address is in a state whose laws do not provide for escheat – is no longer relevant because all fifty states and the District of Columbia now have escheat laws. According to Siemens, that portion of the rule only mattered when some states had no escheat laws at all. And because all states have since enacted some form of escheat regime,[32] individual state

---

[31] Siemens directs us to excel spreadsheets listing open items which the Defendants assert need to be remediated before the audit can be completed. Absent additional development of the evidentiary record, however, we are unable to decipher the legal significance of those spreadsheets.

[32] Those state regimes often differ from one another.

sovereignty must be respected such that even if the state of the creditor's last known address does not provide for escheat of a specific property type, the state of the debtor's incorporation is not permitted to use its own broader escheat law to claim priority. That position, however, cannot be squared with the language of the *Texas* trilogy, which focuses on whether specific property is escheatable, not whether a regime exists.

In its original articulation of the rule, the Supreme Court stated that "where the State of the last known address does not, at the time in question, provide for escheat *of the property*[,]" the "State of corporate domicile could escheat the property, subject to the right of the State of the last known address to recover it if and when its law made provision for escheat *of such property*." *Texas*, 379 U.S. at 682 (emphasis added). Given that focus on the specific property type, we disagree with Siemens's narrow interpretation of the trilogy. In other words, we reject an interpretation foreclosing the state of corporate domicile from claiming priority simply because the state of the creditor's last known address has an escheat regime,

---

For example, business-to-business transactions and gift certificates are exempt from several states' escheatment laws. *See* Douglas L. Lindholm & Ferdinand S. Hogroian, *The Best and Worst of State Unclaimed Property Laws: Cost Scorecard on State Unclaimed Property Statutes*, COUNCIL ON ST. TAX'N 4-5 (Oct. 2013), https://www.cost.org/globalassets/cost/state-tax-resources-pdf-pages/cost-studies-articles-reports/cost-scorecard--the-best-and-worst-of-state-unclaimed-property-laws-october-2013.pdf. Both of those categories are property captured by the Delaware UPL. *Id.* at 9.

regardless of whether that regime would take the property type at issue.[33]  We instead read the *Texas* trilogy to state that, even if the state of the creditor's last known address has an escheat regime, if it does not provide for escheat of the specific property type at issue, then the state of corporate domicile can still claim priority if its broader escheat laws do provide for escheat of that specific property type.  *See Texas*, 379 U.S. at 682.

On the overall question of whether Siemens will prevail on its preemption claim, however, we cannot now say. Standards of review matter, and while a party is allowed to rely on well-pled factual allegations to survive a motion to dismiss, we agree with the Defendants that Siemens cannot "snatch complete victory from the jaws of defeat" in the absence of an

---

[33] We also do not read our decision in *New Jersey Retail Merchants* to suggest otherwise.  That case dealt with New Jersey's ability to escheat property when it was neither the state of the debtor's incorporation nor the state of the creditor's last known address.  *N.J. Retail Merchs. Ass'n*, 669 F.3d at 392-94 ("New Jersey … adopts a place-of-purchase presumption, which … allows the State to escheat abandoned property by virtue of the fact that the property was purchased in New Jersey.  But New Jersey, as the state in which the [property] was purchased, does not have a sufficient connection with any of the parties to the transaction to claim a right to escheat the abandoned property.")  Our understanding of the *Texas* trilogy does not raise similar concerns where the state of the debtor's incorporation is already one of the two states the Supreme Court has authorized to exercise the power of escheat.

adequately developed evidentiary record. (Answering Br. at 35.)

## III. CONCLUSION

For the foregoing reasons, we will vacate the District Court's order dismissing Siemens's preemption claim as unripe and denying Siemens's motion for a preliminary injunction. We will also affirm the District Court's order dismissing Siemens's expedited-audit procedural due process claim for failure to state a claim. The matter will be remanded for further proceedings consistent with this opinion.